# EXHIBIT 1

**EXECUTION VERSION**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") is dated as of July 30, 2021 (the "**Closing Date**"), and is by and among Perry Insurance Group, Inc., a South Carolina corporation ("**Seller**"); David A. Perry, an individual ("**Seller Principal**"); and Relation Insurance Services Select, Inc., a North Carolina corporation ("**Buyer**"). Seller and Seller Principal are sometimes referred to individually herein as a "**Seller Party**" and collectively as "**Seller Parties**". Buyer and Seller Parties are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**". Capitalized terms not otherwise defined herein have the meaning assigned to such terms in Article 24.

## BACKGROUND

WHEREAS, Seller is located in Lexington, South Carolina and is engaged in the Company Business within the Restricted Territory;

WHEREAS, Seller Principal is the direct owner of all of the issued and outstanding equity of Seller;

WHEREAS, Buyer desires to acquire from Seller and Seller desires to sell to Buyer, substantially all of the operations and assets of the Company Business upon the terms and subject to the conditions hereinafter set forth;

WHEREAS, Buyer desires to assume from Seller and Seller desires to assign to Buyer, certain liabilities relating to the Company Business if and only to the extent specifically hereinafter set forth as Assumed Liabilities and upon the terms and subject to the conditions hereinafter set forth; and

WHEREAS, to induce Buyer to enter into this Agreement and consummate the transactions contemplated hereunder, each of the Seller Parties agrees to be bound by the Restrictive Covenants applicable to such Seller Party contained herein.

NOW, THEREFORE, in consideration of the representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to become legally bound, agree as follows:

ARTICLE 1.   SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1   Sale of Assets.  Subject to the terms and conditions of this Agreement, at the Closing (as defined herein), the Seller Parties, as applicable, shall sell, convey, transfer, and irrevocably assign and deliver to Buyer, and Buyer hereby agrees to purchase and acquire from the Seller Parties all rights, title and interests of Seller to the Acquired Assets, free and clear of all Security Interests.

1.2   Excluded Assets.  Property or assets of Seller that are not expressly included in the Acquired Assets are excluded from the sale and shall be retained by Seller and shall include those assets set forth on Schedule 1.2 attached hereto.

1.3     Assumed Liabilities.  From and after the Effective Date and on the terms and subject to the conditions contained in this Agreement, Buyer shall assume, perform, pay and discharge only the Assumed Liabilities set forth on Schedule 1.3 attached hereto and no other liabilities or obligations whatsoever.

1.4     Excluded Liabilities.  Except for the Assumed Liabilities, Buyer shall not assume or be required to perform, pay or discharge any, and the Seller Parties shall remain unconditionally liable for all, of the Seller Parties' debts, obligations, liabilities and commitments, known or unknown, including, without limitation, any and all liabilities arising out of, relating to or in respect of the placement of any In-Force Policy written by, or the sale of any insurance-related products or services offered by, any Carrier that is a Low-Rated Carrier at the time of, and becomes insolvent after, such placement or sale, any and all debts, obligations, liabilities or commitments relating to or arising out of the operation of the Company Business or the ownership of the Acquired Assets prior to the Effective Date, (and including, but not limited to, any debts, obligations, liabilities or commitments that may be imposed on Buyer under a de facto merger, successor transferee, bulk sale or similar theory, absolute, contingent or otherwise, any and all liabilities associated with any Pandemic Relief Debt), other than those that are expressly included in the Assumed Liabilities. All such debts, obligations, liabilities and commitments that are not Assumed Liabilities are referred to as "**Excluded Liabilities**".

1.5     Cash Cut-Off Date.  Any cash that is received prior to the Effective Date and that is attributed to any Acquired Asset shall be and remain the property of Seller.  Any cash received on or after the Effective Date and that is attributable to any Acquired Asset shall be and remains the property of Buyer.

ARTICLE 2.   PURCHASE PRICE

2.1     Cash Consideration; Equity Consideration; Contingent Consideration; Earn-Out Payment. In consideration of the purchase and sale of the Acquired Assets, and Seller Principal entering into the Restrictive Covenants, Buyer shall assume the Assumed Liabilities and Buyer shall pay to Seller Parties the aggregate of the following (the "**Purchase Price**"):

     (a)     *Cash Consideration*.  Cash in immediately available funds in the amount of $7,▮▮▮, less $▮▮▮▮ in operating cash, less $▮▮▮▮ (the "**PPP Loan Amount**") to be paid to the PPP Lender to be held in escrow, less $▮▮▮▮ to pay off all of Seller's long term debt (which for the avoidance of doubt, includes, but is not limited to, Seller's existing lines of credit, if any, and any producer deferred compensation plan liability) (the "**Cash Consideration**"), to be paid to or on behalf of Seller at Closing as designated by Seller prior to Closing; provided, however, if the Net Working Capital reflected in the notice given pursuant to Section 2.3(a) is less than zero dollars ($0.00) then the Cash Consideration paid at Closing shall be adjusted downward "dollar for dollar" in an amount equal to such shortfall, and if such Net Working Capital exceeds zero dollars ($0.00), then the Cash Consideration paid at Closing shall be adjusted upward "dollar for dollar" in an amount equal to such excess.

     (b)     *Equity Consideration*.  The issuance in equity from AQ Sunshine Parent, LLC, a Delaware limited liability company (the "**Issuer**"), equal to an aggregate of $1,▮▮▮ allocated to the Seller Principal (the "**Equity Consideration**").

(c)    *Contingent Consideration*. In addition to the Cash Consideration and Equity Consideration, so long as Seller's EBITDA for the twelve (12) month period ("**Year One EBITDA**") following the Effective Date (the "**First Measurement Period**") meets or exceeds at least ████████████████ Closing EBITDA (the "**Payment Threshold**"), Buyer shall pay up to $1,███ (the "**Contingent Consideration**") to Seller within ninety (90) days of the end of the First Measurement Period based on the following calculation:  if (i) Year One EBITDA fails to meet or exceed the Payment Threshold, then the Contingent Consideration would equal zero dollars and no payment would be made; (ii) Year One EBITDA equals the Payment Threshold, then Seller shall be entitled to ████████ percent (██%) of the Contingent Consideration; (iii) Year One EBITDA meets or exceeds the Closing EBITDA, then Seller shall be entitled to one hundred percent (100%) of the Contingent Consideration; or (iv) Year One EBITDA is greater that the Payment Threshold but less than the Closing EBITDA, then Seller shall be entitled the Contingent Consideration calculated on a sliding scale between $██████ for Year One EBITDA equal to the Payment Threshold and $1,█████ for Year One EBITDA that meets or exceeds Closing EBITDA.  As an example, ████████████████████████████████████ ███████████████████████████████████████████████████████████████

(d)    *Earn-Out Payment*.

(i)    At the end of the thirty-six (36) month period ending on the third (3rd) anniversary of the Effective Date, Seller shall be entitled to receive additional consideration (the "**Earn-Out Payment**"), if any, of up to ████████████ ($██████) multiplied by the Percentage of Earnout Target listed in the table attached as <u>Schedule 2.1(d)(i)</u> that corresponds to the EBITDA CAGR (as defined below).

(ii)    For purposes hereof, the "**EBITDA CAGR**" means the compound annual growth rate of Seller's EBITDA calculated in accordance with the following formula and rounded to the nearest tenth of one percent:

**EBITDA CAGR**    $=$    $$\left[ \left( \frac{x}{y} \right)^{\left( \frac{1}{3} \right)} \right] - 1$$

Where:
$x$ = Seller EBITDA for the Final Measurement Period
$y$ = Closing EBITDA

(iii)    For purposes hereof, the "**Final Measurement Period**" means that twelve (12) month period ending on the third anniversary of the Effective Date

(iv)    The Earn-Out Payment, if any, shall be paid as set forth in <u>Section 2.2</u> below.

2.2    <u>Earn-Out Calculation</u>.

(a)    Within sixty (60) days of the end of the First Measurement Period and the Final Measurement Period, Buyer shall prepare and deliver to Seller Principal a statement setting forth Buyer's calculation of Seller's EBITDA (the "**Estimated EBITDA**") for the applicable

Measurement Period.  All revenue, including Seller's portion of net commissions achieved from cross-selling with Buyer or Buyer's Affiliates, shall be booked consistent with Section 2.2(g) and **Exhibit B** and, otherwise, in the usual manner of Buyer.

(b)     If Seller Principal in good faith disagrees with Buyer's calculation of the applicable Estimated EBITDA, Seller Principal may, within thirty (30) days after receipt of such statement (the "**Objection Period**"), deliver to Buyer a notice disagreeing therewith and setting forth Seller Principal's objections (the "**Objection Notice**").  The Objection Notice shall specify in reasonable detail (consistent with the detail provided by Buyer regarding such computations and materials accompanying the Estimated EBITDA) those items or amounts as to which Seller Principal disagrees, the basis of such disagreement and, if the disagreement relates to the calculation of amounts, Seller Principal's calculation of such amounts.  If the Objection Notice is not timely received by Buyer within the Objection Period, Seller Principal shall be deemed to agree in all respects with the applicable Estimated EBITDA as prepared by Buyer, and such calculation shall be final and binding on the Parties.

(c)     If an Objection Notice is timely received by Buyer within the Objection Period, the Parties shall, during the thirty (30) days following Buyer's receipt of such notice, use their good faith, reasonable efforts to reach an agreement on the disputed items.  If such an agreement is reached, the Estimated EBITDA as so agreed shall be final and binding on the Parties.  If the Parties are unable to reach such an agreement, Buyer and Seller Principal shall jointly retain a mutually acceptable independent accounting firm of regional reputation (the "**Accountant**") to resolve any remaining disagreements.  In the event that Buyer and Seller Principal are not able to mutually agree on an acceptable independent accounting firm, Buyer's primary tax accounting firm will provide two independent accounting firms of regional reputation that Seller Principal shall select from, and if Seller Principal fails to make a selection from such group within three business days of their receipt of such list of firms, then Buyer will make the selection of the Accountant, which will be binding on all Parties.  As used in this Agreement, an "independent accounting firm" shall be one in which neither the firm nor its partners has provided accounting services for Buyer in the last two (2) years and is not an Affiliate of Buyer's primary tax accounting firm.  Buyer and Seller and Seller Principal shall execute, if requested by the Accountant, a reasonable engagement letter, including customary indemnification provisions in favor of the Accountant.  Buyer and Seller Principal shall direct the Accountant to render a determination in writing as promptly as practicable and in any event within thirty (30) days after its retention and the Parties shall cooperate with each other and the Accountant during its engagement and make available the records and workpapers necessary for its presentation and review.  The Accountant shall consider only those items and amounts set forth in the Objection Notice that Buyer and Seller Principal have been unable to resolve, and the Accountant shall review only the records and workpapers submitted by the Parties (without limitation to the Objection Notice) and base its determination solely on such submissions and the related computational materials and principles of consistency set forth in this Agreement.  In resolving any disputed item, the Accountant may not assign a value to any item greater than the greatest value of such item claimed by either Party or less than the smallest value for such item claimed by either Party.  The Accountant's determination shall be based on the definitions included herein and shall otherwise be made in accordance with this Agreement.  The determination of the Accountant shall be conclusive and binding upon the Parties.  The fees and expenses of the Accountant shall be borne by Seller Principal (on the one hand) and Buyer (on the other hand) in proportion to the relative amounts by

which their proposals differed from the Accountant's final determination. For example, if Seller Principal claims either the Contingent Consideration or Earn-Out Payment is $1,000 greater than the amount determined by Buyer and if the Accountant ultimately resolves the dispute by awarding to Seller Principal $300 of the $1,000 contested, then the costs and expenses of the Accountant will be allocated 30% (*i.e.*, 300/1,000) to Buyer and 70% (*i.e.*, 700/1,000) to Seller Principal.

(d)     The Estimated EBITDA (either as agreed to by Seller Principal and Buyer, as deemed final pursuant to Section 2.2(b) above or as adjusted pursuant to Section 2.2(c) above) shall be final and binding on the Parties and will be referred to as Seller EBITDA for the respective Measurement Period, and used to make the final determination of the amount of the Contingent Consideration or Earn-Out Payment, as applicable.

(e)     Buyer and Seller Principal shall cooperate and assist in good faith in the preparation of the Estimated EBITDA and in the conduct of the reviews referred to in this Section 2.2, including making available, to the extent reasonably necessary, books, records, work papers and personnel at such reasonable times as any Party shall request and permitting (at the expense of the requesting Party) the copying of any records or extracts thereof reasonably requested.

(f)     Promptly following the determination of the Contingent Consideration or Earn-Out Payment, if any, shall be deemed due to Seller, and Buyer shall pay Seller (i) the Contingent Consideration, if any, solely in cash in immediately available funds by wire transfer to accounts designated by Seller, and (ii) the Earn-Out Payment, if any, paid ████████ percent (██%) of such amount in cash in immediately available funds by wire transfer to accounts designated by Seller and ████████████ (██%) of such amount in additional equity of Issuer.

(g)     Until the end of the Final Measurement Period, Buyer shall not, directly or indirectly, take any actions with the express purpose and intent of avoiding or reducing the Contingent Consideration or Earn-Out Payment, if any.  The foregoing covenant shall survive the Closing until the expiration of the Final Measurement Period.  Otherwise, the Seller Parties acknowledge that Buyer has the right to operate the Company Business in any way that Buyer deems appropriate in its sole and absolute discretion. The Seller Parties also acknowledge that the Contingent Consideration and Earn-Out Payment are speculative and there can be no assurance that either payment will be earned, and Buyer provides no such assurance.

2.3     Net Working Capital.

(a)     Prior to the Closing, Seller Principal and Buyer shall agree on a form of a statement setting forth in reasonable detail the Net Working Capital as of the Effective Date, for the purposes of calculating any post-Closing adjustments to the Cash Consideration ("**Closing Net Working Capital Sample**").  The statement shall be set forth as Schedule 2.3 hereto and reflect each of the components to be included in the Net Working Capital calculation as agreed to by the Parties.

(b)      Within 120 days following Closing, Buyer shall prepare and deliver to Seller Principal a statement setting forth in reasonable detail its good faith calculation of Net Working Capital as of the Effective Date, which statement shall be prepared using the format of the Closing Net Working Capital Sample and shall be accompanied by any documentation and work papers necessary to support calculations set forth therein or as Seller Principal shall reasonably request

(the "**Closing Net Working Capital**"). The Closing Net Working Capital shall be prepared in accordance with Schedule 2.3. Buyer shall prepare the Closing Net Working Capital on the same basis and applying the same accounting principles, policies and practices that were used in preparing the Closing Net Working Capital Sample, which shall utilize commonplace industry accounting procedures in its calculation of the Closing Net Working Capital including the accrual of current assets and current liabilities. If within thirty (30) days after the delivery of the Closing Net Working Capital to Seller Principal, Buyer and Seller Principal agree upon the calculation of the Closing Net Working Capital calculation, then such calculation shall be deemed final and binding; however, if the Parties do not so agree, then the Parties will cooperate and assist in good faith in the preparation of the Closing Net Working Capital and in the conduct of the reviews referred to in this Section 2.3, including making available, to the extent reasonably necessary, books, records, work papers and personnel at such reasonable times as any Party shall request and permitting (at the expense of the requesting Party) the copying of any records or extracts thereof reasonably requested, until the Parties reach an agreement on the Closing Net Working Capital or otherwise resolve any remaining disputes. The Party entitled to an adjustment in respect to the Closing Net Working Capital under Section 2.1(a) shall pay such amount in cash to the other Party promptly upon reaching agreement or resolving such dispute. Notwithstanding any other provision of this Agreement, any adjustment in liabilities used in calculating Closing Net Working Capital shall not give rise to a claim for indemnification nor reduce the indemnity Basket unless Seller Parties fail to pay Buyer any required amounts.

2.4    Acknowledgment of Restrictive Covenants. Each of the Seller Parties hereby agrees to abide by his or its respective Restrictive Covenants and acknowledges and agrees that the payment of the Purchase Price is, in part, full consideration for his and its respective Restrictive Covenants, and the associated Goodwill included in the Acquired Assets.

2.5    Allocation of the Purchase Price. The Parties shall allocate the Purchase Price among the Acquired Assets for financial accounting and tax purposes as set forth on **Exhibit A** hereto. The Parties acknowledge and agree that the tax allocation, if any, of Purchase Price to Restrictive Covenants shall not, in any way, limit any remedy available to Buyer for any breach by any Seller Party of any Restrictive Covenants. The Earn-Out Payment and Contingent Consideration, if any, will be treated in accordance with Section 483 of the Internal Revenue Code of 1986 as amended, and corresponding Treasury Regulations thereunder.

ARTICLE 3.    REPRESENTATIONS AND WARRANTIES OF BUYER

3.1    Buyer represents and warrants to Seller Parties the following:

(a)    Organization; Authority; Enforceability. Buyer is duly incorporated and validly existing under the laws of the State of North Carolina. Buyer has the necessary corporate power and authority, and has taken all corporate action necessary, to execute and deliver this Agreement, and all other documents and agreements executed or to be executed by it under or in connection with this Agreement, and to perform its obligations hereunder and thereunder. This Agreement does, and all other documents and agreements to be executed by Buyer as contemplated hereunder shall, constitute the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, subject to the effect of receivership, conservatorship or supervisory powers of insurance regulatory agencies and subject to the effect of bankruptcy, insolvency,

reorganization, moratorium or similar laws now or hereafter in effect relating to or affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)     No Conflicts.   The execution and delivery of this Agreement and the other documents and agreements to be executed by Buyer as contemplated hereunder, the consummation of the transactions contemplated hereby or thereby, and the compliance with the terms and conditions hereof or thereof will not (i) contravene any provision of law or any statute, decree, rule, regulation, injunction, judgment, order, ruling, charge, or other restriction binding upon Buyer or contravene any order or permit applicable to Buyer; or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of any obligation under, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under, any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound.

(c)     Required Filings and Consents.  The execution and delivery of this Agreement and the other documents and agreements to be executed by Buyer as contemplated hereunder and the taking of any action by Buyer in connection with this Agreement require no authorizations, consents or approvals of, or exemptions by, or notice to, or filings with any Governmental Entity, including, without limitation, any insurance regulatory authorities.

(d)     Litigation and Claims.  There is no pending or, to Buyer's Knowledge, threatened claim, charge, complaint, demand, hearing, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Entity to which Buyer is a party, which seeks to restrain, condition or prohibit the transactions contemplated herein.

(e)     Brokers, Finders and Agents.  Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, advisor or agent with respect to the transactions contemplated hereunder for which the Seller Parties may become liable.

ARTICLE 4.   REPRESENTATIONS AND WARRANTIES OF THE SELLER PARTIES

4.1     Seller Principal represents and warrants the following to Buyer on behalf of himself:

(a)     Capitalization.  Seller Principal holds of record and owns beneficially all of the outstanding equity of Seller. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting of the equity of Seller. There are no options, agreements, understandings (whether exercisable now or in the future and whether contingent or otherwise) that entitle or are reasonably likely to entitle any Person to call for or require the purchase or transfer of any equity in Seller.

(b)     No Conflicts.  The execution and delivery of this Agreement, the other documents and agreements to be executed by Seller Principal as contemplated hereunder, the consummation of the transactions contemplated hereby and thereby, and the compliance with the terms and conditions hereof or thereof will not: (i) contravene any provision of law or any statute, decree, rule, regulation, injunction, judgment, order, ruling, charge, or other restriction binding upon Seller Principal or contravene any order or permit applicable to Seller Principal; (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of any obligation under, create

in any party the right to accelerate, terminate, modify or cancel, or require any notice under, any agreement, contract, lease, license, instrument, or other arrangement to which Seller Principal is a party, or by which Seller Principal is bound, or to which Seller Principal's assets are subject, that is not being fully discharged at Closing; or (iii) result in the attachment, creation or imposition of any Security Interest upon any of the Acquired Assets and/or Assumed Liabilities.

(c)    <u>Required Filings and Consents</u>.  The execution and delivery of this Agreement and the other documents and agreements to be executed by Seller Principal as contemplated hereunder and the taking of any action by Seller Principal in connection with this Agreement require no authorizations, consents or approvals of, or exemptions by, or notice to, or filings with any Governmental Entity, including, without limitation, any insurance regulatory authorities.

(d)    <u>Litigation; Claims and Compliance with Laws</u>.  There is no pending or, to Seller Principal's Knowledge, threatened claim, charge, complaint, demand, hearing, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Entity to which Seller Principal is a party, which seeks to restrain, condition or prohibit the transactions contemplated herein.

(e)    <u>Accredited Investor</u>.  Seller Principal is an "accredited investor" as defined under the Securities Act of 1933, as amended ("**Securities Act**"), and the regulations related thereto, and is acquiring the Equity Consideration for his own account for investment purposes only and not with a view to the resale or distribution of the Equity Consideration within the meaning of the Securities Act.

4.2    The Seller Parties, jointly and severally, represent and warrant the following to Buyer:

(a)    <u>Organization; Authority; Enforceability</u>.  Seller is duly organized and validly existing under the laws of the State of South Carolina. Seller has the necessary corporate power and authority, and has taken all corporate action necessary, to execute, deliver and perform this Agreement and all other documents and agreements executed or to be executed by it under or in connection with this Agreement, and to perform its obligations hereunder and thereunder.  This Agreement does, and all other documents and agreements to be executed by Seller, as contemplated hereunder shall, constitute the legal, valid and binding obligation of Seller enforceable in accordance with their terms and conditions, subject to the effect of receivership, conservatorship or supervisory powers of insurance regulatory agencies and subject to the effect of bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to or affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Seller has no subsidiaries and is not a party to any joint venture or partnership agreement.

(b)    <u>No Conflicts</u>.  The execution and delivery of this Agreement, the other documents and agreements to be executed by Seller as contemplated hereunder, the consummation of the transactions contemplated hereby and thereby, and compliance with the terms and conditions hereof or thereof will not (i) contravene any provision of law or any statute, decree, rule, regulation, injunction, judgment, order, decree, ruling, charge, or other restriction binding upon Seller or contravene any order or permit applicable to Seller; (ii) conflict with or result in any breach of any terms, covenants, conditions or provisions of, or constitute a default (with or without the giving of

notice or passage of time or both) under the charter documents of Seller; (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of any obligation under, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under, any agreement, contract, lease, license, instrument, or other arrangement to which such Seller Party is a party, or by which Seller is bound, or to which Seller's assets are subject; or (iv) result in the attachment, creation or imposition of any Security Interest upon any of the assets, rights, contracts or other property of Seller.

(c)     Required Filings and Consents.  The execution and delivery of this Agreement and the other documents and agreements to be executed by Seller as contemplated hereunder and the taking of any action by Seller in connection with this Agreement requires no authorizations, consents or approvals of, or exemptions by, or notice to, or filings with any Governmental Entity, including, without limitation, any insurance regulatory authorities.

(d)     Litigation and Claims; Compliance with Law.

(i)     Except as set forth on Schedule 4.2(d)(i), there is no pending or, to any Seller Party's Knowledge, threatened claim, charge, complaint, demand, hearing, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Entity to which Seller is a party related to the Company Business or which affect the Acquired Assets.  Except as set forth on Schedule 4.2(d)(ii), since at least January 1, 2017, there have been no claims, charges, complaints, demands, hearings, actions, suits, arbitrations, inquiries, proceedings or investigations by or before any Governmental Entity, nor any settlements or similar agreements to which Seller was a party.  There are no judgments or outstanding orders, injunctions, decrees, stipulations or awards (whether rendered by a court or Governmental Entity, or by arbitration) against Seller related to the Company Business or which affect the Acquired Assets and/or Assumed Liabilities.

(ii)     Seller has conducted the Company Business in all material respects in compliance with all applicable laws, rules, regulations and ordinances.  Without limiting the foregoing, no Seller Party has engaged in price fixing, bid rigging or any other anticompetitive activity.  In connection with the conduct of the Company Business, no Seller Party, nor any director, officer, employee, Producer, member, shareholder or equity owner of Seller, has (A) directly or indirectly given or agreed or offered to give any illegal gift, contribution, payment or similar benefit to any supplier, Client, governmental official or employee or other Person who was, is or may be in a position to help or hinder Seller (or assist in connection with any actual or proposed transaction) or made or agreed or offered to make any illegal contribution, or reimbursed or agreed or offered to reimburse any illegal political gift or contribution made by any other Person, to any candidate for federal, state, local or foreign public office or exert any illegal influence; or (B) established or maintained any unrecorded fund or asset or made any false entries on any books or records for any purpose related to or otherwise affecting Seller.

(e)     Title; Debt.

(i)     Seller has sole, good and marketable title to, and is the sole record and beneficial owner of, all of the Acquired Assets (including, without limitation, all Client Accounts and Clients and Active Prospective Clients relationships used or required in connection with the conduct of Company Business, and all records, files, data and other records related thereto) and

may sell, transfer and assign the Acquired Assets to Buyer pursuant to this Agreement and vest in Buyer sole, full and complete record and beneficial ownership of the Acquired Assets. Seller has not previously sold, transferred or assigned any of its rights in or to any of the Acquired Assets. Except as set forth in Schedule 4.2(e)(i), the Acquired Assets are free and clear of all Security Interests and no shareholder, member, employee or any other Person or entity has any ownership interest, claim, right to solicit, or other present or contingent right or interest in or to any of the Acquired Assets.

(ii)      Schedule 4.2(e)(ii) sets forth all outstanding debt of Seller, whether secured or unsecured, which has been incurred outside the Ordinary Course of Business.

(f)      Real Property.  Seller does not own any real property used for the Company Business.  Except as set forth in Schedule 4.2(f), Seller Principal does not own any real property used for the Company Business.  Schedule 4.2(f) sets forth all real estate leased by Seller for the Company Business (the "**Leases**").  Except as set forth on Schedule 4.2(f), with respect to each Lease:  (i) the agreement is the legal, valid, binding, enforceable obligation of Seller and the lessor thereto and is in full force and effect in all material respects and has not been amended or supplemented in any manner since a copy thereof was delivered to Buyer; (ii) Seller has duly performed in all material respects all of its obligations to the extent such obligations to perform have accrued; (iii)(A) neither Seller nor, to Seller's Knowledge, the lessor thereto is in breach or default thereof, and (B) no event has occurred which, with notice or lapse of time, would constitute a default, or give rise to a right of offset or a defense by Seller or, to Seller's Knowledge, lessor; (iv) neither Seller nor, to Seller's Knowledge, the lessor thereto has repudiated any material provision of the agreement; (v) such Lease is assignable by Seller to Buyer without the consent or approval of the lessor or such lessor's consent to assignment has been obtained; and (vi) Seller enjoys quiet enjoyment of such Lease. Seller and any of its Affiliates have complied in all material respects with all Environmental, Health, and Safety Laws, and no proceeding has been filed, commenced or threatened against Seller or any of its Affiliates alleging any failure so to comply, with respect to any real property owned or leased by Seller or any of Seller's Affiliates and used in connection with the Company Business.

(g)      Software.  The current material software applications used by Seller in the operation of the Company Business are set forth on Schedule 4.2(g) hereto ("**Seller's Software**").  Seller's Software, to the extent it is licensed from any third-party licensor or it constitutes "off the shelf" software, is held by Seller under valid, binding and enforceable licenses for use on the hardware on which it is installed and in that manner is fully transferrable to Buyer without any third party's consent. All of Seller's computer hardware has validly licensed software installed therein. Seller has not sold, assigned, licensed, distributed or in any other way disposed of or encumbered Seller's Software.

(h)      Insurance.  Since at least January 1, 2017, Seller has been covered by insurance in scope and an amount that is customary and reasonable for the Company Business.  Schedule 4.2(h)(i) hereto contains a description of all policies of insurance maintained by Seller, including, but not limited to, fire and casualty, property, workers' compensation, errors and omission coverage and business interruption; all premiums have been paid when due and no default exists with respect to any of such policies and all of such policies are in full force and effect.  All such policies have been made available, together with all endorsements, amendments

and riders, to Buyer for examination and inspection. Seller has notified all applicable insurance companies that have issued the policies listed on Schedule 4.2(h)(i) of any and all incidents, events or circumstances of which any Seller Party has Knowledge that could reasonably give rise to a covered claim under such policy. Except as set forth on Schedule 4.2(h)(ii), there are no open or pending claims, and there have not been any reported or settled potential or actual claims since at least January 1, 2017.

(i)     Taxes and Tax Returns. Seller has filed all Tax Returns that are required to have been filed on or prior to the Closing Date by Seller or the Acquired Assets and has paid or will pay and satisfy prior to the Closing Date all Taxes, if any, which are shown thereupon as due and owing, or which otherwise are required to be paid by Seller or with respect to the Acquired Assets. All such Tax Returns are true, correct and complete in all material respects. Seller has withheld and paid all Taxes required by applicable law to have been withheld and paid in connection with amounts paid or owing to any employee, Producer or contractor, creditor, shareholder, or other third party. There are no liens with respect to Taxes upon any of the assets or properties of Seller, other than with respect to Taxes not yet due and payable. No deficiency for any Taxes has been proposed, or is expected to be proposed to the Knowledge of Seller, against Seller or with respect to the Acquired Assets, which deficiency has not been paid in full. There is no audit, litigation or arbitration or administrative proceeding or claim asserted, pending or, to the Knowledge of Seller, threatened respecting or involving Seller, the Company Business, or any of the Acquired Assets with respect to any Tax.

(j)     Financial Statements. Attached hereto as Schedule 4.2(j) are true, correct and complete copies of the following unaudited financial statements with respect to the Company Business (collectively "**Seller Financial Statements**"): (i) balance sheet of Seller as of December 31, 2018, together with the related statement of revenues and expenses for the twelve (12) month period then ended, (ii) balance sheet of Seller as of December 31, 2019, together with the related statement of revenues and expenses for the twelve (12) month period then ended, (iii) balance sheet of Seller as of December 31, 2020, together with the related statement of revenues and expenses for the twelve (12) month period then ended, and (iv) balance sheet of Seller as of the last day of the last full calendar month prior to the Closing Date (the "**Balance Sheet Date**"), together with the related statement of revenues and expenses for the period then ended. Seller Financial Statements: (i) have been prepared in accordance in all material respects with the books and records of Seller; (ii) have been prepared in accordance in all material respects with Seller's past practices applied on a basis consistent with prior periods; and (iii) present fairly in all material respects the financial condition of Seller as of December 31, 2018, December 31, 2019, December 31, 2020, and the Balance Sheet Date, respectively, and its results of operations for the periods then ended, except that the Seller Financial Statements omit the PPP Loan on the basis of the Seller's assertion the PPP Loan is qualified for full forgiveness.

(k)     Production Statements. Attached hereto as Schedule 4.2(k)(i) are Seller's production statements for the twelve (12) month period ending on the Balance Sheet Date related to the Company Business (the "**Production Statements**"), including for each of the Client Accounts the net commissions and/or fees received from or with respect to each such Client Account. The Production Statements were produced from the books and records of Seller (which books and records are true, correct and complete in all material respects) and are true, correct and complete in all material respects. Except as set forth on Schedule 4.2(k)(ii), since January 1, 2019,

-11-

no Client Account generating more than $1,000 in annual net commissions and fees contained in the Production Statements has discontinued or materially reduced its business relationship with Seller.   No Seller Party has any reason to believe that any Client with a Client Account reflected in the Production Statements generating more than $1,000 in annual net commissions and fees intends to discontinue or materially reduce its business relationship with a Seller Party (or with Buyer, following the Closing).  Seller's net commissions and fees for the twelve (12) month period ending on the Balance Sheet Date were not less than $█████ arising from the Client Accounts placed through Seller for the commissions and/or fees set forth on the Production Statements. There are no oral or written agreements, commitments or understandings with respect to any Client Account whereby any of the commissions or fees received by Seller are being returned directly or indirectly to any Client or any other Person.  Seller has made available for inspection by Buyer all insurance accounts, dailies, Client lists, policy expirations and renewals and all records, files and other information pertaining thereto prepared and maintained by Seller for all its Clients and Active Prospective Clients related to the Company Business.

(l)  Absence of Changes.  Except as set forth on Schedule 4.2(l), since January 1, 2019, (i) there have been no events, changes or conditions which, individually or in the aggregate, have had or would reasonably be expected to have a material adverse effect specifically upon Seller, the Company Business or any of the Acquired Assets or the Assumed Liabilities (other than general economic or industry conditions including but not limited to the COVID-19 global pandemic); (ii) Seller has in all material respects conducted the Company Business in the Ordinary Course of Business, including, without limitation, not accelerating the collection of any accounts receivables or commission payments or delaying the payment of any accounts payable; and (iii) neither the Acquired Assets nor the Company Business have incurred any liabilities except in the Ordinary Course of Business.

(m)  No Undisclosed Liabilities.  Other than the Assumed Liabilities and the PPP Loan, Seller has no liability, whether known or unknown (including, without limitation, any liability that may arise in the future from past errors, omissions or other events or existing circumstances or any liability which may arise under an alter ego, de facto control, de facto merger, successor, transferee or other similar theory), whether absolute, contingent or otherwise relating to the Company Business, except for liabilities reflected on the face of the balance sheet of Seller as of the Balance Sheet Date and liabilities of the type set forth on the face of such balance sheet which have arisen after the Balance Sheet Date in the Ordinary Course of Business (none of which is a liability for breach of contract or warranty or involves a tort, infringement, claim, lawsuit or environmental, health or safety matter).

(n)  Employees.  Schedule 4.2(n) sets forth a true, complete and accurate list showing all officers, directors, consultants and employees of Seller, including Producers (each an "**Employee**"), and the rate of compensation (and the portions thereof attributable to salary, bonus and other compensation, respectively), specifying their status as exempt or non-exempt from overtime under the FLSA, and any accrued sick leave and accrued vacation of each of such Persons as of the Closing Date. Seller has complied in all material respects and is in compliance in all material respects with all applicable employment laws, rules, regulations, and ordinances, and Seller is not liable for any arrears of wages, Taxes or penalties for failure to comply, in all material respects, with any of the foregoing, including, without limitation, the classification of Persons as employees or independent contractors.  Seller has not received a claim from any Governmental

Entity to the effect that Seller has improperly classified any of the Employees as (x) exempt or non-exempt from overtime under the FLSA or (y) independent contractors rather than employees, and no basis for either such claim exists.  Seller is not a party to any collective bargaining agreements.

(o)     <u>Employee Benefit Plans</u>.

(i)     With respect to each "employee benefit plan" within the meaning of Section 3(3) of ERISA, and each other compensation and benefit plan, contract, policy, program and arrangement in effect as of the date hereof, which is maintained, sponsored or contributed to by Seller (other than routine administrative procedures) in which any of the Employees or their dependents participate (each an "**Employee  Plan**"), each Employee Plan has been operated and administered in all material respects in accordance with its terms and applicable law and administrative or governmental rules and regulations, including ERISA and the Code, except to the extent any noncompliance would not reasonably be expected to result in any liability imposed upon Buyer.  Neither Seller nor any ERISA Affiliate has any outstanding liability or could reasonably be expected to incur liability under Section 430(k) of the Code and/or Title IV of ERISA (other than for the payment of Pension Benefit Guaranty Corporation premiums in the ordinary course).

(ii)     Each Employee Plan which is intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service and, to Seller's Knowledge, no event has occurred and no condition exists which would reasonably be expected to result in the revocation of any such determination.

(iii)     Seller does not contribute to, or is it required to contribute or has ever contributed to, any multiemployer plan as defined in Section 4001(a) of ERISA or an employee benefit plan subject to Title IV of ERISA.  No Employee Plan is subject to Title IV of ERISA or the minimum funding requirements of Section 412 of the Code or Section 302 of ERISA.

(p)     <u>Material Agreements</u>.  <u>Schedule 4.2(p)</u> lists the following contracts and other agreements related to the Company Business that, for <u>subparts (ix)</u> and <u>(x)</u> individually provide for aggregate future payments to or from Seller of $2,500 or more, of potential liabilities, (the "**Material Agreements**") to which Seller or any of its Affiliates or employees, is a party: (i) any written agreement for the provision to any Client of Company Business; (ii) any agreement which provides for the sharing of commissions, including, without limitation, with any third-party or any Affiliate, or which requires Seller (in connection with Company Business) to guarantee any amount or make a minimum payment; (iii) any agreement (or group of related agreements) with any insurance carrier, broker or agency relating to the provision of Company Business; (iv) any agreement involving the acquisition or transfer of material assets relating to Company Business within twelve (12) months prior to the Closing Date or pursuant to which any party thereto has any remaining material obligations; (v) any agreement (or group of related agreements) under which it has created, incurred, assumed, or guaranteed any indebtedness for borrowed money, or under which a Security Interest has been imposed on any of Seller's assets, tangible or intangible; (vi) any employment or independent producer agreement; (vii) any agreement forming a partnership or joint venture; (viii) any agreement which requires Seller, or any employee of  Seller, to maintain the confidentiality of Confidential Information, or to refrain from competing with, or soliciting or

accepting business from the clients or customers of, a Person other than Seller; (ix) any license for the software applications listed on Schedule 4.2(g) other than any such licenses that constitute "off-the-shelf" software; and (x) any other agreement which is material to the Company Business. Except as set forth in Schedule 4.2(p), Seller has made available to Buyer either an original or a true, correct and complete copy of each written Material Agreement described in Schedule 4.2(p). With respect to each Material Agreement described in Schedule 4.2(p):  (1) the agreement is the legal, valid, binding, enforceable obligation of the applicable Seller Party and, to the Knowledge of Seller, the other party thereto and is in full force and effect in all material respects and has not been terminated, cancelled, amended or supplemented in any manner since being delivered to Buyer, subject to bankruptcy and equitable remedies exceptions; (2) Seller has duly performed in all materials respects all of its obligations to the extent such obligations to perform have accrued; (3)(A) neither Seller nor, to the Knowledge of Seller, any other party thereto is in breach or default thereof, and (B) no event has occurred which, with notice or lapse of time, would constitute a material breach or default of, or permit termination, modification, or acceleration under, the Material Agreement; (4) neither Seller nor, to the Knowledge of Seller, any other party thereto has repudiated any material provision of the agreement; and (5) except as set forth in Schedule 4.2(p), the Material Agreement is assignable by Seller to Buyer without the consent or approval of any other party.  There exist no material oral agreements with respect to the Company Business or Acquired Assets.

(q)     Transactions with Affiliates.  Except as set forth on Schedule 4.2(q), no officer, director, shareholder, member, manager, or Affiliate of a Seller Party, or any party (including a family member) related to any such officer, director, shareholder, member, manager or Affiliate, or any entity in which any such Person or individual owns any beneficial interest, is a party to any contract, agreement, arrangement or transaction with Seller or has any interest in any of the Acquired Assets.

(r)     Underwriting Risk.  No Seller Party owns, or has any investment or interest in, any captive insurance company or insurance carrier or underwriter.  No Seller Party is a party to any agreements, arrangements or understandings which would require such Seller Party to assume any underwriting risk.

(s)     Producers.

(i)     Schedule 4.2(s)(i) is a list of all employees and independent contractors who are responsible for sales or business development of the Company Business (the "**Producers**") and specifically identifies for each such individual if he or she is an employee or an independent contractor. For avoidance of doubt, "**Producer**", as defined herein, includes account executives that are responsible for business development and/or serve as the principal contact with any Client Account.  Except as set forth on Schedule 4.2(s)(ii), each Producer of Seller is a party to a contract that is in full force and effect and each such contract contains restrictive covenants regarding maintaining Seller's confidentiality and non-solicitation/non-acceptance of such Client Accounts post-termination of employment.

(ii)     Except as set forth on Schedule 4.2(s)(iii), Seller does not have any contractual arrangement (written or oral) with any sub-producer, referral source, or other similar counterparty. There are no disputes or proceedings pending or, to Seller's Knowledge, threatened

against Seller with respect to any current or former sub-producer, referral source or similar service provider of Seller. Seller has complied in with all applicable Laws relating to the engagement of any current and former sub-producer, referral source, or similar service provider of Seller. Seller Parties have made available to Buyer any and all confidentiality, trade secret, non-competition and non-solicitation agreements, whether oral or written, in place (or that remain effective with respect to post-termination obligations) between Seller and any current or former sub-producer, referral source, or similar service provider of Seller. As of the Closing Date, Seller has paid in full all obligations or liabilities which have arisen under contract, applicable law or otherwise in connection with all current and former sub-producer, referral source or similar service provider of Seller (except for those liabilities included in the calculation of Net Working Capital).

(iii)     During the 24-month period preceding the date of this Agreement, (A) neither Seller nor any of its Affiliates have hired any employee or independent contractor in violation of any restrictive covenant, non-compete agreement or non-solicitation agreement to which such employee or independent contractor is a party; and (B) no Person has made an allegation or asserted a claim that Seller or any of its Affiliates have hired any employee or independent contractor in violation of any such restrictive covenant, non-compete agreement or non-solicitation agreement.

(iv)     All commissions, sub-broker, referral and similar fees paid or payable by Seller have been made in compliance with all applicable laws and regulations.

(t)     Licenses.  Seller and its respective Producers and other employees possess all insurance and other material licenses and sublicenses, permits and other authorizations and approvals issued by regulatory and other governmental agencies and instrumentalities that are necessary for Seller to conduct Company Business as presently conducted.  Schedule 4.2(t) sets forth all such licenses and sublicenses held by Seller and its respective Producers and its other employees.  Such licenses and sublicenses of Seller and its Producers and other employees are in good standing, and, to Seller's Knowledge, there are no disciplinary proceedings or investigations pending or threatened against Seller or any of its respective Producers or other employees.  There has been no occurrence or set of circumstances that may give rise to any such disciplinary proceeding or investigation.

(u)     Low-Rated Carrier.  The Seller has a valid and effective appointment to act as an insurance agent or broker for each insurance carrier that issues an In-Force Policy brokered, placed or sold by the Seller.  Except as set forth on Schedule 4.2(u), Seller has not brokered, placed or sold any In-Force Policy with insurance carriers or other underwriters having an "AM Best" rating below "A-" ("**Low-Rated Carrier**").  If Seller has brokered, placed or sold any In-Force Policy with a Low-Rated Carrier, (i) Seller has disclosed the "A.M. Best" rating of each Low-Rated Carrier to the applicable insured and (ii) Seller has received from the applicable insured a written acknowledgement of such rating and a waiver from responsibility for any liability in connection with or resulting from the financial condition of such Low-Rated Carrier.

(v)     Insurance Premium Assets.  As of the Closing Date, Seller's Insurance Premium Assets exceed their aggregate Insurance Premium Liabilities (including premium accounts payable to insurance carriers), as set forth on Schedule 4.2(v).

(w)     Client Service Agreements.  Seller has in place written agreements with any and all Clients for which it currently performs services for a fee paid directly by the Client and all such agreements are set forth on Schedule 4.2(w), true and complete copies of which have been delivered to Buyer. There are no service agreements with Clients whereby Seller would be required to continue providing services, without additional compensation, to such Client after the termination effective date of the applicable service agreement. There are no guarantees of performance at pre-defined service levels under any agreements relating to Client Accounts.

(x)     Appointments.

(i)     Seller and its Producers have an appointment to act as an agent or broker for each insurance company from which such an appointment is used to conduct Company Business; each such appointment is valid and binding in accordance with its terms on the parties thereto; and there has been no indication that any such appointment will be, and to Seller's Knowledge no grounds exist which may reasonably result in any such appointment being revoked, limited, rescinded or terminated.  Neither Seller nor any of its Producers is a party to any agreement (oral or written) which prevents it from doing business with any insurance company, agent, or broker.  Neither Seller nor any of its Producers has bound, or committed to bind, any insurance coverage for any liability, risk, cost, or expense, or in any amount of liability, risk, cost, or expense, or upon any terms or conditions, which exceeds its binding authority in any respect.  Neither Seller nor any of its Producers is in default under any of its material obligations to any insurance company, agent or broker through which it places insurance.  Schedule 4.2(x) is a true and complete schedule of: (i) each insurance company, agent and broker through which Seller and its Producers have placed insurance in calendar year 2020 and year to date 2021 for those companies, agents or brokers through which Seller and its Producers placed at least ninety percent (90%) of their respective commissions, setting forth the name of each such company, agent or broker and the total commission by each such company, agent or broker during the applicable period; and (ii) each insurance company which paid ▮▮▮▮▮▮ ($▮▮▮) Dollars or more of contingent commissions to Seller or its Producers in either of such periods, setting forth the name of each such insurance company and the amount of the contingent commissions paid to the applicable Seller Party.

(ii)     Seller has delivered to or made available for inspection by Buyer true and complete copies of the appointments and agreements (or, in the case of any insurance company, agent or broker with which Seller has no written agreement, a true and complete written description of the arrangement between such entity and Seller) currently in effect between Seller or its Producers and each insurance company, agent and broker listed in Schedule 4.2(x) and each such appointment agreement or written description materially sets forth the terms and provisions of the agreement between Seller or its Producers and such insurance company, agent or broker as currently in effect.

(y)     Compensation Disclosure.  Since January 1, 2017, Seller and its Producers have maintained policies and procedures designed to ensure that they have disclosed to each of their customers and each group of customers the nature and extent of all forms of compensation received by Seller or its Producers, directly or indirectly, from insurers, insurance intermediaries, or premium finance companies or other businesses in consideration for placing business with, or otherwise arranging business for, such businesses, including (but not limited to) profit sharing,

-16-

sales commission sharing, contingent, supplemental, bonus, override, excess commissions or any other such similar compensation.

(z)     Disclosure Controls and Procedures.  Seller has established and maintains disclosure controls and procedures that are designed to ensure that material information relating to Seller and the Company Business is made known to Seller's chief executive officer by others within Seller, and such disclosure controls and procedures are effective to perform the functions for which they were established.  Seller maintains no off-the-books accounts, and its assets are used only in accordance with Seller's management directives.  Since January 1, 2016, no Seller Party has been advised of: (i) any material deficiencies in the design or operation of internal controls affecting Seller's ability to record, process, summarize and report financial data; or (ii) any fraud, whether or not material, that involves management or other employees who have a role in Seller's internal controls.

(aa)     Brokers, Finders and Agents.  Except as set forth on Schedule 4.2(aa), no Seller Party has any liability or obligation to pay any fees or commissions to any broker, finder, advisor or agent with respect to the transactions contemplated hereunder for which Buyer may become liable.

(bb)     Intellectual Property.  Schedule 4.2(bb) sets forth an accurate and complete list of all material Intellectual Property and proprietary software used by any Seller Party in the Ordinary Course of Business of the Company Business.  Such Seller Party solely owns free and clear of all Security Interests, all right, title and interest in and to, or has a valid and enforceable right to use pursuant to a license agreement all Intellectual Property set forth on Schedule 4.2(bb).

(cc)     Sufficiency. The Acquired Assets constitute all of the material assets necessary for the Seller Parties to conduct the Company Business as it is presently conducted and to conduct the business as reflected in Seller's Financial Statements and Production Statements.

(dd)     Full Disclosure.  To any Seller Party's Knowledge, no representation or warranty made by Seller, nor any statement, documents or certificate furnished by Seller pursuant to this Agreement, contains or will contain any untrue statement of material fact or omits or will omit to state any material fact necessary to make the statements contained herein or therein not misleading. The disclosure of an exception by a Seller Party shall not relieve such Seller Party from its obligations described in Article 6 hereof with respect to such disclosure. Nothing in any Schedule of the Seller Parties attached hereto shall be deemed adequate to disclose an exception to a representation or warranty made herein, however, unless the Schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail.

(ee)     Pandemic-Relief Debt.  Seller applied for and received Pandemic-Relief Debt in the aggregate amount of the PPP Loan Amount from First Community Bank (the "**PPP Lender**"). As to any Pandemic-Relief Debt incurred by Seller:  (i) Seller met (and, as applicable, continues to meet) the eligibility requirements for receipt of such Pandemic-Relief Debt under Pandemic-Relief Debt Documentation (including, without limitation, with application of all applicable affiliation requirements under applicable legal requirements), (ii) all representations and warranties made by Seller, pursuant to the Pandemic-Relief Debt Documentation are true and correct in all material respects, (iii) Seller is in compliance in all material respects with all

Pandemic-Relief Debt Documentation and without limiting the generality of the foregoing has used, if Seller has ever used, the proceeds of any such Pandemic-Relief Debt exclusively for purposes permitted by the Pandemic-Relief Debt Documentation (including, as to any PPP Loan exclusively for PPP Specified Forgivable Uses); (iv) Seller has maintained all records required to be submitted in connection with applying for, obtaining, using the proceeds of, or seeking forgiveness of such Pandemic-Relief Debt; and (v) Seller has provided to Buyer true, correct and complete copies of all Pandemic-Relief Documentation included in subsections (i) and (iii) of the definition of such term with respect to such Pandemic-Relief Debt.

ARTICLE 5.   CLOSING

5.1      Closing.  The closing of the transaction contemplated by this Agreement (the "**Closing**") shall take place on the date hereof via the electronic exchange of counterpart signature pages, and the delivery of the original documents shall be made promptly following the Closing Date.  This Agreement shall be effective as of 11:59 pm Eastern Time on July 30, 2021 (the "**Effective Date**").

5.2      Seller Party Deliverables.  At Closing and as a condition to Closing, Seller Parties shall deliver:

(a)      Evidence that Seller has taken all necessary action required to authorize the execution and performance of this Agreement and all other documents, agreements and transactions contemplated under this Agreement.

(b)      Certificates dated within twenty (20) days prior to the Closing Date from the Secretary of State of the State of South Carolina and to the effect that Seller validly exists and is in good standing in such jurisdiction.

(c)      Evidence of the authority and incumbency of the Persons acting on behalf of Seller in connection with the execution of this Agreement and any document delivered pursuant to this Agreement.

(d)      An executed Bill of Sale in the form of the **Bill of Sale Exhibit**.

(e)      Executed employment agreements, in the form of the **Employment Agreement Exhibit**, between Buyer's parent company Relation Insurance, Inc. ("**Relation**") and each individual listed on such **Employment Agreement Exhibit**, including Seller Principal, or as otherwise determined by Buyer following Closing.

(f)      Executed Confidentiality & Non-Solicitation Agreements, in the forms as determined by Buyer, between Relation and each individual listed on such **CNSA Exhibit**, or as otherwise determined by Buyer following Closing.

(g)      An executed Assignment and Assumption Agreement in the form of the **Assignment and Assumption Agreement Exhibit**.

(h)      Executed documentation related to the Equity Consideration.

(i)    Copies of all consents, approvals and waivers necessary to assign the contracts listed on Schedule 1.1(e).

(j)    Evidence that all Security Interests relating to the Acquired Assets have been released.

(k)    Office Lease for the Seller's office location, in terms agreeable to Buyer, for the current office space occupied by the Company Business in the form of the **Office Lease Exhibit**.

(l)    Signatory cards for all bank accounts listed on Schedule 1.1(l), as well as instructions from the financial institutions for each such bank account providing as follows: (i) granting Buyer online access to such bank accounts, (ii) granting Buyer the ability to transfer and withdraw funds from such bank accounts, and (iii) adding a Buyer representative as a signatory to such bank accounts.

(m)    Subject to the additional covenant set forth in Section 7.7 below, evidence of binding of a three (3) year (the "**Coverage Period**") errors and omissions insurance tail policy (the "**Tail Policy**") with a deductible and policy limit consistent with Seller's prior policy.

(n)    (i) A certification of non-foreign status for Seller dated as of the Closing Date and complying with the requirements of Treasury Regulation Section 1.1445-2(b)(2); and (ii) all clearance certificates or similar documents which are available from any governmental authority in order to relieve Buyer of (A) any obligation to withhold any portion of the Purchase Price, or (B) any liability for Taxes (determined without regard to the provisions of this Agreement assigning responsibility therefor) for which relief is available by reason of the filing of an appropriate certificate.

All actions to be taken by the Seller Parties in connection with the consummation of the transactions contemplated hereby and all certificates, instruments, and other documents reasonably required to effect the transactions contemplated hereby, will be reasonably satisfactory in form and substance to Buyer.  Buyer may waive any condition specified in this Section 5.2.

5.3    Buyer Deliverables.  At the Closing and as a condition to Closing, Buyer shall deliver, or shall cause to be delivered, the following:

(a)    The Cash Consideration.

(b)    Executed documentation related to the Equity Consideration.

(c)    Executed employment agreements, in the form of the **Employment Agreement Exhibit**, between Relation and each individual listed on such **Employment Agreement Exhibit**, including Seller Principal.

(d)    An executed Assignment and Assumption Agreement in the form of the **Assignment and Assumption Agreement Exhibit**.

(e)    Office Lease for the Seller's office location, in terms agreeable to Buyer, for the current office space occupied by the Company Business in the form of the **Office Lease Exhibit**.

(f)     Executed Confidentiality & Non-Solicitation Agreements, in the forms as determined by Buyer, between Relation and each individual listed on such **CNSA Exhibit**.

All actions to be taken by Buyer in connection with consummation of the transactions contemplated hereby, and all certificates, instruments, and other documents required to effect the transactions contemplated hereby, will be reasonably satisfactory in form and substance to Seller Principal.  Seller Principal may waive any condition specified in this Section 5.3.

ARTICLE 6.   INDEMNIFICATION

6.1   Survival.

(a)     All of the representations and warranties of the Parties set forth in this Agreement shall survive the Closing for thirty-six (36) months following the Closing Date; provided, however, that (i) the representations and warranties contained in Sections 4.1(a), (b) and (d) and Sections 4.2(a), (b), (d), (e), (n), (v) and (aa) (the "**Fundamental Reps**") shall survive the Closing indefinitely; and (ii) the representations and warranties contained in Section 4.2(i) (the "**Tax Rep**") shall survive the Closing until three (3) months following the expiration of the statute of limitations applicable to matters covered thereby.  Notwithstanding the preceding sentence, any representation or warranty in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate pursuant to the preceding sentence if written notice of the inaccuracy or breach thereof giving rise to such right of indemnity has been given to the Party against whom such indemnification may be sought prior to such time.

(b)     Any covenant or agreement of any Party hereto that is to be performed on, before or after the Closing Date shall survive the Closing for the lesser of the time period provided in this Agreement with respect to such covenant or agreement or sixty (60) days beyond the applicable statute of limitations.

(c)     Any covenant or agreement of any Party hereto that is to be performed on or prior to the Closing Date and which cannot be or is not fully performed prior to the Closing Date shall survive the Closing until the earlier of (i) the date on which such covenant or agreement is fully performed; and (ii) thirty-six (36) months following the Closing Date.

6.2   Indemnification by Buyer.  Buyer shall defend, indemnify and hold the Seller Parties and their Affiliates and their respective directors, officers, members, shareholders and employees (the "**Seller Indemnitees**"), and each of them, harmless from any Adverse Consequences resulting from or arising out of or otherwise relating to (a) any inaccurate representation or warranty made by Buyer in this Agreement; (b) any breach or default in the performance of any of the covenants or agreements made by Buyer in this Agreement; (c) any claim, action or cause of action or other liability arising out of or resulting from or relating to the Assumed Liabilities; or (d)  Buyer's operation/use of the Acquired Assets  following Closing, provided that such Adverse Consequences are not the result of (i) any  inaccurate representation or warranty made by the Seller Parties, or any of them, in this  Agreement, (ii) any breach or default in the performance of any of the covenants or agreements  made by the Seller Parties, or any of them, in this Agreement, or (iii) any claim, action or cause  of action or other liability arising out of or resulting from or relating to the Excluded Liabilities.

6.3   <u>Indemnification by Seller Parties</u>.

(a)   Subject to the limitations herein, the Seller Parties shall jointly and severally, defend, indemnify and hold Buyer and its Affiliates and their respective directors, officers, members, shareholders and employees (the "**Buyer Indemnitees**"), and each of them, harmless from any Adverse Consequences resulting from, arising out of or otherwise relating to (i) (A) any inaccurate representation or warranty made by the Seller Parties, or any of them, in this Agreement, (B) any breach or default in the performance of any of the covenants or agreements made by the Seller Parties, or any of them, in this Agreement, and (C) any claim, action or cause of action or other liability arising out of or resulting from or relating to the Excluded Liabilities; (ii) any liability or Adverse Consequences arising out of or resulting from or relating to the Seller's Pandemic-Relief Debt; and/or (iii) any Seller Party's ownership and operation of the Company Business and/or Acquired Assets prior to the Closing.

(b)   The representations and warranties of the Seller Parties contained in <u>Article 4</u>, and the covenants of the Seller Parties contained herein, are joint and several obligations.  Accordingly, each Seller Party will be responsible, to the extent provided hereunder, for the entirety of any Adverse Consequences suffered by any Buyer Indemnitee thereof as a result of a breach by any Seller Party of any such representation and warranty.

(c)   Without limiting any statutory, equitable or common law remedy that Buyer may have for a breach of this Agreement by any Seller Party, Buyer shall have the right, but shall not be required to, satisfy any claim for indemnification (subject to the terms and conditions contained in this <u>Article 6</u>) for any Adverse Consequences resulting from, arising out of or otherwise relating to such breach by, upon notice to the Seller Parties and subject to the Basket described in <u>Section 6.3(d)</u> below, setting off against either, in the sole discretion of Buyer, (i) the amount of any Contingent Consideration or Earn-Out Payment, if any, payable to any of the Seller Parties or (ii) the Equity Consideration (at the same valuation used on the Closing Date), on a dollar-for-dollar basis, the amount of any Adverse Consequences sustained by any Buyer Indemnitee.  Prior to exercising any such right of set-off, Buyer shall prepare and deliver to Seller Parties a statement setting forth in reasonable detail its calculation of such amount to be set off (the "**Set-Off Amount**").  The Set-Off Amount may not be deducted from any compensation contractually due from Buyer or its Affiliates to the Seller Principal under any employment agreement. If, within thirty (30) days after receipt by Seller Parties of the statement of Set-Off Amount, Buyer and Seller Principal agree upon the Set-Off Amount, then such Set-Off Amount shall be deemed final and binding; however, if the Parties do not so agree, then Seller Parties and Buyer shall, within thirty (30) days after their receipt of such statement submit their calculations of the Set-Off Amount to binding arbitration, in accordance with the rules of the American Arbitration Association (the "**AAA**"), which arbitration shall be carried out in the manner hereinafter set forth.

(i)   The arbitration proceeding shall be before a single arbitrator selected in accordance with the rules of the AAA and shall take place at a mutually agreeable location in Walnut Creek, California or such other location as agreed to by the Parties.

(A)   The award rendered by the arbitrators shall be final, binding and conclusive, and judgment may be entered upon it in accordance with applicable law in the appropriate court in the State of North Carolina, with no right of appeal therefrom.

(B)        Each Party shall pay its or his own expenses of arbitration, and the expenses of the arbitrator and the arbitration proceeding shall be equally shared unless the arbitrator affirmatively finds that a Party raised or resisted a claim substantially for purposes of delay or oppression and awards the expenses of arbitration and the arbitrator accordingly.

(C)        During the pendency of the arbitration proceeding, Buyer shall be entitled to withhold any payments due to Seller Parties, if any, in an amount equal to the Set-Off Amount to the extent provided by this Agreement.

(d)        The Seller Parties shall not be liable for any indemnity (a) unless and until the aggregate amount subject to indemnification hereunder exceeds     ; in which case the Seller Parties shall be liable only for the amount in excess of $     (the "**Basket**"); and (b) in excess of $     (the "**Indemnity Cap**"), except (i) if such Seller Parties have engaged in Fraud and/or an Intentional and Willful Violation, or (ii) as set forth in Section 6.3(f) below.  For the purpose of this Agreement, "**Fraud**" shall mean an intentional and willful false statement of fact made by any of the Seller Parties in this Agreement and its Schedules with actual knowledge of the falsity of such fact for the purpose in inducing Buyer to enter into the transaction contemplated by this Agreement and which is relied on by Buyer in entering into the transactions contemplated by this Agreement.  "**Intentional and Willful Violation**" means the refusal or failure to perform a covenant under this Agreement provided such Seller Party who refuses or fails to perform such covenant had no intention at the time such Seller Party entered into this Agreement to perform such covenant.

(e)        Each of the Seller Parties specifically acknowledges and agrees that monetary damages will not be an adequate remedy for a breach of any of the Restrictive Covenants, and that irreparable injury will result to Buyer and/or Buyer's Affiliates and their respective successors in interest in the event of any such breach.  Accordingly, each Seller Party agrees that Buyer or such other Buyer Affiliate (as applicable) shall be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, a temporary or permanent injunction, restraining and enjoining such Party, or any Person with which such Party is associated or by which such Party is employed, from further violations of such provisions, without the posting of any security or bond in connection therewith.

(f)        The Basket and Indemnity Cap, shall not apply to limit the indemnification required by the Seller Parties caused by (i) a breach of any Fundamental Rep or Tax Rep, (ii) any Adverse Consequences, including without limitation all costs, fees, judgments, orders, injunctions, decrees, stipulations or awards associated with, or related to, the litigation or regulatory matters set forth in Schedule 4.2(d), (iii) any Adverse Consequences, including without limitation all costs, fees, judgments, orders, injunctions, decrees, stipulations or awards associated with, or related to, the open or pending claims set forth in Schedule 4.2(h)(ii), (iv) arising from the Seller Parties' covenants set forth in Article 23, (v) any Adverse Consequences arising out of or resulting from or relating to the Excluded Liabilities, (vi) any Adverse Consequences arising from the Tail Policy's coverage, or lack thereof, pursuant to Section 7.7 below or (vii) any Persons claiming ownership interest to any Acquired Assets, as any Adverse Consequences arising from the foregoing activities set forth in subparts (i), (ii), (iii), (iv), (v), (vi) and (vii) of this sentence will require first dollar indemnity without any cap.

6.4     <u>Matters Involving Third Parties</u>.

(a)     If any Seller Indemnitees or Buyer Indemnitees (an "**Indemnitee**") entitled to seek indemnification under this <u>Article 6</u> receives notice of the assertion, commencement or institution of a claim, suit, action or proceeding, or the imposition of a penalty or assessment by a third party that is not an Indemnitee (a "**Third-Party Claim**"), and the Indemnitee intends to seek indemnification hereunder for such Third-Party Claim, then the Indemnitee shall promptly provide the Party against whom such indemnification may be sought (the "**Indemnifying Party**") with written notice of such Third-Party Claim (including any written demand, complaint, petition, summons or similar document relating thereto that is then in the Indemnitee's possession), but in any event not later than thirty (30) days after receipt of notice of such Third-Party Claim.  Any delay in providing, or the failure to provide such notification, shall not affect the right of the Indemnitee to indemnification hereunder except in the event that such delay or failure extends past the applicable survival expiration date set forth in <u>Section 6.1</u>, or to the extent that the Indemnifying Party is materially prejudiced by the delay or failure.

(b)     In connection with any Third-Party Claim, the Indemnifying Party may elect, by written notice to the Indemnitee, to assume and control, at its sole expense, the defense of any such Third-Party Claim, and shall, at its sole expense, retain counsel (reasonably satisfactory to the Indemnitee) in connection therewith; provided, however, that the Indemnifying Party will not have such right:

(i)     unless the Indemnifying Party has acknowledged in writing, within twenty (20) days following the Indemnifying Party's receipt of notice of the Third-Party Claim, to such Indemnitee the election of the Indemnifying Party to assume the defense of the Third-Party Claim;

(ii)     unless the Indemnifying Party has provided to such Indemnitee reasonable evidence that the Indemnifying Party has sufficient financial resources to defend such Third-Party Claim;

(iii)     if such Indemnitee reasonably and in good faith believes that such Third-Party Claim would be reasonably detrimental to the reputation, relations with insurance carriers, brokers, Clients or suppliers, or business of the Indemnitee or any of its Affiliates or such Third-Party Claim involves relief other than monetary damages;

(iv)     if such Third-Party Claim involves criminal allegations; or

(v)     if an outside counsel advises the Indemnifying Party and the Indemnitee that there are actual unresolvable conflicting interests between the Indemnifying Party and the Indemnitee with respect to the Third-Party Claim.

(c)     After the assumption of such defense by the Indemnifying Party, the Indemnifying Party shall not be responsible for the payment of legal fees or expenses incurred thereafter by the Indemnitee (who may, however, continue to participate in, but not control, the defense of such Third-Party Claim with separate counsel and at its own expense other than as provided in <u>Section 6.4(b)</u>).

(d)     In the event that the Indemnifying Party shall assume the defense of the Third-Party Claim, it shall not settle or compromise such Third-Party Claim unless (i) the Indemnitee gives its prior written consent, which consent shall not be unreasonably conditioned, withheld or delayed; or (ii) the terms of settlement or compromise of such Third-Party Claim provide that the Indemnitee shall have no responsibility for the discharge of any settlement amount and impose no other obligations or duties on the Indemnitee (including any admission of culpability), and the settlement or compromise discharges all claims against the Indemnitee with respect to such Third-Party Claim.  The Indemnitee shall cooperate with the defense of any such Third-Party Claim and shall provide such personnel, technical support and access to information as may be reasonably requested by the Indemnifying Party in connection with such defense.

(e)     If the Indemnifying Party does not or does not have the right to undertake the defense, compromise or settlement of a Third-Party Claim in accordance with Section 6.4(b), the Indemnitee will have the right to control the defense or settlement of such Third-Party Claim with counsel of its choosing (reasonably satisfactory to the Indemnifying Party) but shall not settle or compromise such Third Party Claim without the consent of the Indemnifying Party (such consent not to be unreasonably withheld, delayed or conditioned). The Indemnifying Party will be entitled to participate in, but not control, the defense of any Third-Party Claim with separate counsel and at its own expense.  The Indemnifying Party shall cooperate with the defense of any such Third-Party Claim and shall provide such personnel, technical support and access to information as may be reasonably requested by the Indemnitee in connection with such defense.

6.5     Notice of Direct Claims.  Any claim for indemnification of Adverse Consequences under this Article 6 that is not a Third-Party Claim (a "**Direct Claim**") by an Indemnitee shall be asserted by giving the Indemnifying Party prompt written notice thereof; provided, however, that any delay in providing, or the failure to provide such notification, shall not affect the right of the Indemnitee to indemnification hereunder except in the event that such delay or failure extends past the applicable survival expiration date set forth in Section 6.1, or to the extent that the Indemnifying Party is materially prejudiced by the delay or failure.  Such notice shall describe the Direct Claim in reasonable detail, including (to the extent practicable) copies of any written evidence thereof and indicate the estimated amount of Adverse Consequences, if reasonably practicable, that has been sustained by the Indemnitee.  The Indemnifying Party will have a period of thirty (30) days within which to respond in writing to such Direct Claim.  If the Indemnifying Party does not so respond within such 30-day period, the Indemnifying Party will be deemed to have rejected such claim, in which event the Indemnitee will be free to pursue such remedies as may be available to the Indemnitee on the terms and subject to the provisions of this Article 6.

6.6     Tax Treatment of Indemnity Payments.  Buyer and the Seller Parties will treat any indemnity payment made pursuant to this Article 6 as an adjustment to the Purchase Price for all Tax purposes.

ARTICLE 7.   POST-CLOSING COVENANTS

7.1     Cooperation.  Buyer and the Seller Parties shall cooperate with each other to facilitate the orderly transfer of the Acquired Assets and Company Business to Buyer, including but not limited to, certifying, executing or transferring all necessary documents and information to Buyer as may be reasonably required by Buyer for such purpose. After the Closing, each of the Parties agrees to

give access to the other and to provide and/or execute such documents as may be reasonably requested by the other in order to consummate the transactions between the Parties contemplated hereby and hereunder.

7.2     Lender Cooperation.  Following Closing, within ten (10) days of Buyer's written request, Seller Parties will execute documentation that is required by Buyer's lead lender, including requests regarding the subordination of the Contingent Consideration and Earn-Out Payment hereunder to Buyer's repayment obligations to such lender.  If subordination is required, such documentation will provide that so long as no event of default with respect to such debt financing from such lead lender has occurred and is continuing, that the regularly-scheduled payment of the applicable payment may be made to the Seller Parties pursuant to this Agreement. Such cooperation shall not require the Sellers to join in the application or liability for such financing nor disclose personal assets or information of Seller Principal beyond certification whether Seller Principal is an accredited investor.

7.3     Reserved.

7.4     Bank Accounts.  Within thirty (30) days of Closing, Seller Parties shall coordinate with Buyer and take all reasonable steps to provide Buyer with access to and ownership of, including the ability to transfer, deposit, and withdraw funds, as well as the addition of a signatory on behalf of Buyer and the removal of all signatories on behalf of any Seller Party, all bank accounts included in the Acquired Assets as listed on Schedule 1.1(l). The Parties shall cooperate with the bank holding such accounts in order to accurately reflect the beneficial ownership and tax identification number associated with such accounts or alternative accounts reasonably satisfactory to Buyer.

7.5     Data Export.  Seller Parties shall export from Seller's agency management software to Buyer any and all data relating to the Company Business (including, without limitation, the information and documents related to the Seller's Clients and their policies, as well as premium, commissions, underwriting data and expiration date information). The data shall be exported in Excel, csv, tab delimited format, or such other format acceptable to Buyer (the "**Data Export Files**"), and Seller Parties shall use their best efforts to provide said files to Buyer at or before Closing for import into Buyer's software. In the event that any portion of the Data Export Files are not delivered at or before Closing, Seller Parties shall deliver such Data Export Files as soon as reasonably possible, and Seller Parties and Buyer each hereby agree to use best efforts to finalize the delivery of such Data Export Files as soon as practically possible after the Closing Date but in no event later than ninety (90) days after the Closing Date. In the event Buyer does not receive the Data Export Files at or before Closing, Buyer and its Affiliates shall have full access to all files without redaction, other edit, or delay immediately following the Effective Date.

7.5     PPP Loan.  Seller hereby acknowledges and agrees that (a) it has informed Buyer that it has applied, or intends to apply, for forgiveness of its Pandemic Relief Debt; and (b) Seller has retained its Pandemic-Relief Debt following the Closing to be treated as an Excluded Liability hereunder with the PPP Loan Amount held in escrow by the PPP Lender.  Buyer shall have no liability whatsoever with respect to Seller's Pandemic Relief Debt.

7.6     Retained Variable Life Insurance Business.  Notwithstanding anything in Section 9.1 to the contrary, the Seller Parties shall be allowed to continue to engage in the Retained Variable Life

Insurance Business; provided, however, that (a) in accordance with Section 9.1(e), the Seller Parties shall not use the Acquired Marks or any variations or derivations thereof in connection with the Retained Variable Life Insurance Business; and (b) at any time upon the written request of the Buyer, the Seller Parties shall (i) use commercially reasonable efforts to transition the Retained Variable Life Insurance Business to the platform of the Buyer or any of its Affiliates, and (ii) place any future variable life insurance business under the platform of the Buyer or any of its Affiliates. If the Buyer provides such written request to the Seller pursuant to the foregoing clause (b) (any such notice, the "**Transfer Notice**"), then the Buyer agrees to pay to the Seller an amount equal to the product of (A) two (2) multiplied by (B) the Net Revenue (as defined below) actually received by the Buyer from the Retained Variable Life Insurance Business that is transferred to the Buyer or any of its Affiliates during the period from the date of the Transfer Notice until the first (1st) anniversary thereof (such amount being the "Transfer Payment"). The Transfer Payment, if any, shall be paid in full to the Seller within sixty (60) days of the first (1st) anniversary of the date of the Transfer Notice. As used herein, "Net Revenue" means the difference of (1) the commissions the Buyer or any of its Affiliates actually receives from the applicable insurance company or broker-dealer in connection with such Retained Variable Life Insurance Business (which, for the avoidance of doubt, does not include any Contingent Revenues), minus (2) the sum of (I) any compensation paid to any third party (e.g., any non-Relation employee) producers or brokers and/or vendors of services related to or associated with such Retained Variable Life Insurance Business and (II) any return commissions (or other returned revenue).

7.7     Tail Policy. The Parties acknowledge that the Seller Parties were unable to add the Buyer or Relation as additional insureds under the Tail Policy prior to Closing. Accordingly, in the event any claim is asserted against Buyer or Relation during the Coverage Period, the Seller Parties shall, jointly and severally, indemnify Buyer and Relation for any Adverse Consequences suffered to the extent that such Adverse Consequences would have been covered under the Tail Policy had Buyer and Relation been included as additional insureds.

ARTICLE 8.     TAXES

8.1     Tax Returns. The Parties acknowledge and agree that the Seller Parties shall be responsible for and shall prepare all Tax Returns of the Seller Parties for all periods, and Buyer shall be responsible for and shall prepare the Tax Returns of Buyer for all periods.

8.2     Indemnification of Tax Claims. Any other provision of this Agreement notwithstanding: (i) each Seller Party shall jointly and severally indemnify the Buyer Indemnitees and hold them harmless from and against any loss, claim, liability, expense, or other damage attributable to (A) Taxes (or the non-payment thereof) of any Seller Party for all taxable periods, or (B) any Taxes relating to the ownership or operation of the Acquired Assets for the taxable periods (or portions thereof) ending on or before the Closing Date; (ii) the covenants set forth in this Article 8 shall survive for a period of sixty (60) days following the expiration of the applicable statute of limitations; and (iii) any indemnification amounts owed by each Seller Party or Buyer pursuant to this Section 8.2 are payable to the other on a dollar-for-dollar basis from dollar one.

8.3     Transfer Taxes. All transfer, documentary, sales, use, stamp, registration and other such Taxes, and recording, filing and other fees (including any penalties and interest), incurred in connection with the consummation of the transactions contemplated by this Agreement shall be

paid by such Seller Party when due, and such Seller Party will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees.

ARTICLE 9.  RESTRICTIVE COVENANTS

9.1     Restrictive Covenants.  The Seller Parties acknowledge and agree that substantial and valuable assets, are being transferred to Buyer hereunder that include Confidential Information, relationships with Clients and Active Prospective Clients, and the associated Goodwill of Seller, that the relationships which Buyer (including as a result of this transaction) has with its employees and Producers are significant business relationships necessary for Buyer to continue to operate the business being acquired hereunder and the Acquired Assets, and that Buyer, as a result of this transaction, shall be engaged in providing Company Business throughout the Restricted Territory. The Seller Parties further acknowledge and agree that Buyer and each of Buyer's Affiliates has a reasonable, necessary and legitimate business interest in protecting the aforesaid assets and relationships and businesses, and that the covenants set forth below are reasonable and necessary in order to protect these legitimate business interests.  The Seller Parties further acknowledge and agree that a portion of the Purchase Price, shall constitute, among other things, full consideration for such covenants, and the associated Goodwill included in the Acquired Assets. In addition, the Seller Parties acknowledge and agree that monetary damages will not be an adequate remedy for any material breach of any of the Restrictive Covenants and that irreparable injury may result to Buyer and/or Buyer's Affiliates, or their successors in interest (Reference is made to Section 6.3(e) hereof relating to the rights of the Buyer's Affiliates to equitable relief for breaches of this Section 9.1).  Finally, the Seller Parties acknowledge, as contemplated as part of the terms herein, that contemporaneously with the execution of this Agreement, Buyer shall enter into an Employment Agreement with Seller Principal that shall also include additional, separate restrictive covenants. Accordingly, from and after the Closing, each Seller Party agrees to the following restrictions:

(a)     No Seller Party will, directly or through another under such Seller Party's supervision or control, use, or willfully disclose to any Person, any Confidential Information of any Seller Party, Buyer or any Buyer Affiliate, or any of the terms of this Agreement and negotiations relating thereto, except (i) with the prior written consent of Buyer; (ii) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event such Person shall notify Buyer, as the case may be, as promptly as practicable (and, if possible, prior to the making of such disclosure); or (iii) with respect to the terms of this Agreement and negotiations relating thereto, to Seller Parties' professional advisors who have a need to know such information, provided, however, that the Seller Parties shall ensure that confidential treatment will be accorded to such disclosed Confidential Information by their professional advisors and shall be liable for any disclosure thereof by any such advisor.  In addition, Seller Principal will use commercially reasonable efforts to prevent any such prohibited use or disclosure by any other Seller Party, director, officer, Employee, Producer or agent of any Seller Party.

(b)     Except as an agent of Buyer and on behalf of Buyer, no Seller Party will, directly or through another under such Seller Party's supervision or control, (i) solicit the provision of any Company Business from; (ii) provide or accept any request to provide any Company Business to; or (iii) otherwise induce the termination or non-renewal of any Company Business to, any Client included in the Acquired Assets or any Client of Buyer, or any other Buyer Affiliate, with whom

Seller Principal had contact during his or her employment with Buyer, Relation or Seller, or with whom he became familiar as a result of such employment. The restrictions contained in this subsection (b) shall terminate upon the later to occur of the fifth anniversary of the Effective Date or two years after that date in which a Seller Principal ceases to be employed by Buyer or an Affiliate of Buyer, if so employed (the "**Cessation Date**").

(c)     Except as an agent of Buyer, on behalf of Buyer or with the prior written consent of Buyer, each Seller Party will refrain from Carrying on a Business, directly or through another under a Seller Party's supervision or control, which provides any Company Business within the Restricted Territory. The restrictions contained in this subsection (c) shall terminate on the later of the fifth anniversary of the Effective Date or two years following the Cessation Date. The term "**Carrying on a Business**" shall mean to engage (including by way of solicitation of any Client or accepting any offer to provide Company Business to any Client) in any such Company Business (other than on behalf of Buyer) as a sole proprietor, partner, member of a limited liability company, officer, director, employee, stockholder or similar capacity. It is expressly agreed that the foregoing is not intended to restrict or prohibit, and shall not restrict or prohibit, the ownership by such Seller Party of stock or other securities of a publicly-held corporation in which such Seller Party does not possess beneficial ownership of more than 5% of the voting stock of such corporation or participate in any consulting, management or advisory capacity.

(d)     No Seller Party will, directly or through another under such Seller Party's supervision or control, solicit, hire, employ, or otherwise retain the services of any active employee or independent contractor of Buyer or any other Buyer's Affiliates that was providing services to Buyer or any of Buyer's Affiliates during the six month period prior to the Cessation Date, or otherwise induce any such employee or independent producer to terminate his or her relationship, or to breach an employment agreement, with such company. The restrictions contained in this subsection (d) shall terminate on the later of the fifth anniversary of the Effective Date or two years following the Cessation Date.

(e)     No Seller Party will use, or grant to any Person the right to use at any time, any of the registered or unregistered trademarks and service marks (and any derivations thereof) used in providing Company Business (the "**Acquired Marks**"), or any similar names, juxtapositions or derivations thereof, without the prior written consent of Buyer. Promptly following the Closing Date, but in no event later than thirty (30) calendar days, the Seller Parties will change the name of Seller and any of its Affiliates to names that do not include any Acquired Marks or any name or mark similar thereto and make all necessary legal filings with the appropriate Governmental Entities to effect such change. To the extent the Seller Parties or their Affiliates use any Acquired Marks or any derivation thereof on stationery, signage, invoices, receipts, forms, advertising and promotional materials, product, training and service literature and materials, computer programs, websites or on any other materials or in any other manner prior to or at the Closing, all such use shall cease and terminate at the Closing Date, except as agreed upon by Buyer. Further, the Seller Parties shall execute any documentation requested by Buyer to enable the transfer of all rights to the full use and enjoyment of the Acquired Marks.

(f)     If any of the Seller Parties or any of their heirs, successors or assigns (i) shall consolidate with or merge into any other corporation or entity and shall not be the continuing or surviving corporation or entity of such consolidation or merger; (ii) shall sell a majority of its

controlling equity interests to any individual, corporation or other entity; or (iii) shall transfer a material portion of its properties and assets to any individual, corporation or other entity, then, and in each such case, proper provisions shall be made so that the heirs, successors and assigns of the Seller Parties or any of their heirs, successors or assigns, as the case may be, shall assume all of the obligations set forth in this <u>Section 9.1</u>; *provided, however,* such Seller Party(s) shall not be relieved from its obligations without the written consent of Buyer.  The provisions of this <u>Section 9.1</u> are intended to be for the benefit of, and shall be enforceable by, Buyer.

(g)     At any time, Buyer may, in its sole discretion, upon written notice signed by the Chief Executive Officer or General Counsel of Buyer to any of the Seller Parties, reduce, qualify or narrow (but not increase) the time period for which this <u>Article 9</u>, the Restricted Territory, or any other applicable restriction (including any defined term) to this <u>Article 9</u> for such a Seller Party, as set forth in such written notice.  For the avoidance of doubt, no written notice shall be effective unless it is signed by the Chief Executive Officer or General Counsel of Buyer and no other employee of Buyer shall have authority to reduce, qualify or narrow the restrictions contained herein.

ARTICLE 10. <u>RESERVED</u>

ARTICLE 11. <u>AMENDMENT, MODIFICATION AND WAIVER</u>

No amendment, modification or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by all Parties; provided, however, that any of the terms or provisions of this Agreement may be waived in writing at any time by the Party that is entitled to the benefits of such waived terms or provisions.  No waiver of any of the provisions of this Agreement shall be deemed to be, or shall constitute, a waiver of any other provision hereof (whether or not similar).  No delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

ARTICLE 12. <u>ENTIRE AGREEMENT</u>

This written document and all schedules and exhibits hereto expresses the entire purchase agreement among the Parties with respect to the subject matter hereof and supersedes any prior agreements or understandings concerning such subject matter.

ARTICLE 13. <u>THIRD-PARTY BENEFICIARIES</u>

Subject to <u>Article 20</u>, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein expressed or implied shall give or be construed to give any Person, other than the Parties and such assigns, any legal or equitable rights hereunder.

ARTICLE 14. <u>EXPENSES</u>

All expenses incurred by each of the Parties in connection with or related to the authorization, preparation and execution of this Agreement and the closing of the transactions contemplated hereby, including, without limitation, all fees and expenses of agents, representatives, consultants, counsel and accountants employed by any such Party, shall be borne solely by the Party which has incurred such expense.

ARTICLE 15. <u>NOTICE</u>

All written notices, demands and requests of any kind which any Party may be required or may desire to serve upon any other Party in connection with this Agreement shall be in writing and shall be delivered only by (i) personal delivery (which, for the avoidance of doubt, shall not include delivery via email); (ii) registered or certified mail, in each case, return receipt requested and postage prepaid; or (iii) nationally recognized overnight courier, with all fees prepaid (each, a "**Notice**").  All Notices shall be addressed to the Parties to be served as follows:

| | |
|---|---|
| If to any Seller Party: | David A. Perry<br>Perry Insurance Group, Inc.<br>5465 Sunset Boulevard<br>Lexington, South Carolina 29072 |
| With required copies to (which shall not constitute Notice): | Robert W. Scholz<br>Ellis Funk, P.C.<br>3490 Piedmont Rd. Suite 400<br>Atlanta, Georgia   30305-1743<br>Telephone: (404) 233-2800<br>Email: bob@robertwscholz.com |
| If to Buyer: | Relation Insurance Services Select, Inc.<br>Attn: Legal Department<br>1277 Treat Boulevard, Suite 400<br>Walnut Creek, California 94597<br>Email: kate.rager@relationinsurance.com |
| With required copies to (which shall not constitute Notice): | Midtown GC, PLLC<br>Attn: W. Wilhelm Rabke<br>3122 West Marshall Street, Suite 100<br>Richmond, Virginia 23230<br>Telephone: (804) 823-3944<br>Email: will@midtowngc.law |

Service of any such notice or demand so made shall be deemed complete on the day of actual delivery thereof as shown by the addressee's registry or certification receipt or other evidence of receipt, or refusal of delivery.  Any Party may from time to time by notice in writing served upon the other as aforesaid designate a different mailing address or a different or additional Person to which all such notices or demands hereafter are to be addressed.

ARTICLE 16. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL</u>

      (a)     This Agreement shall be governed by, and construed under, the laws of the State of North Carolina, and all rights and remedies shall be governed by said laws, without regard to principles of conflicts of laws.  To the fullest extent permitted by law, the Parties hereto agree that any claim, suit, action or proceeding seeking to enforce any provision of, or based on any matter

arising out of or in connection with, this Agreement or the other agreements or transactions contemplated hereby shall only be brought in the state courts in the State of North Carolina or the Federal courts in each case located in the State of North Carolina, and not in any other State or Federal courts located in the United States of America or any court in any other country, and each of the Parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  To the fullest extent permitted by law, process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.

(b)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

ARTICLE 17. <u>SEVERABILITY</u>

If any provision of this Agreement, whether a paragraph, sentence or a portion thereof, is determined by a court of competent jurisdiction to be null and void or unenforceable, such provision shall be deemed to be severed, and the remaining provisions of this Agreement shall remain in full force and effect.

ARTICLE 18. <u>PUBLIC ANNOUNCEMENTS</u>

No Seller Party shall make any public statements, including any press releases or any other public (or non-confidential) disclosure (whether or not in response to an inquiry), with respect to this Agreement and the transactions contemplated hereby without the prior written consent of Buyer except as may be required by applicable law.  If a public statement by any Seller Party is required to be made by applicable law, the Seller Parties shall use commercially reasonable efforts to consult with the Buyer in advance as to the contents and timing thereof.

ARTICLE 19. <u>HEADINGS</u>

All paragraph headings herein are inserted for convenience of reference only and shall not modify or affect the construction or interpretation of any provision of this Agreement.

ARTICLE 20. <u>SUCCESSORS AND ASSIGNS</u>

The terms and conditions of this Agreement shall inure to the benefit of and be binding upon each of the Parties hereto and their respective heirs, successors and permitted assigns, and the indemnification provisions of this Agreement shall also inure to the benefit of any Seller Indemnitees or Buyer Indemnitees in accordance with the terms thereof.  This Agreement may not be assigned by any Seller Party without the prior written consent of Buyer.

ARTICLE 21. <u>REFORMATION</u>

Should any provision of this Agreement be held unenforceable or invalid under the laws of the United States of America or the State of North Carolina, or under any other applicable laws of any other jurisdiction, then the Parties agree that such provision shall be deemed reformed and modified for purposes of performance of this Agreement in such jurisdiction to the extent necessary to render it lawful and enforceable.

ARTICLE 22. COUNTERPARTS

This Agreement, and any amendment hereto, may be executed in two or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument. A facsimile or electronic copy of any such signed counterpart shall be treated and shall have the same force and effect as an originally signed counterpart.

ARTICLE 23. BULK SALES LAW

The Parties hereby waive compliance with any applicable law with respect to the bulk sale of assets and Seller covenants and agrees to pay and discharge when due all claims of creditors which could be asserted against Buyer by reason of such non-compliance.

ARTICLE 24. DEFINITIONS

Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them below:

"**Accountant**" as defined in Section 2.2(c).

"**Active Prospective Client**" means, any Person, or a group of Persons, (i) who or which had been identified with reasonable particularity by any Seller Party (or any of its agents or Producers) in the business records of such Person within the twenty four (24) months preceding a specified date, with reasonable particularity as a possible client or customer of such Person; or (ii) to whom a Person (or any of its agents) had communicated within the twenty four (24) months preceding a specified date, in writing or otherwise as set forth in the business records of such Person, with respect to the provision of any services that such Person provides in the conduct of its business.

"**Acquired Marks**" as defined in Section 9.1(e).

"**Acquired Assets**" means all the assets of Seller except the Excluded Assets, including, but not limited to:

(a)     The list of Seller's Clients (all of which are listed on Schedule 4.2(k)(i) to this Agreement) and Active Prospective Clients, all of Seller's insurance expirations and all rights of renewal thereof and any other Client or renewal lists used in connection with providing Company Business, together with Seller's associated Goodwill, Confidential Information, files, claim files, books, records, ledgers, correspondence and other usual and customary records, and advertising and promotional materials, studies and reports used in connection therewith (provided however that Seller may retain its tax records and minute books);

(b)    The sole right to collect and to retain (i) all insurance commissions collected on or after the Effective Date (including gross retained commissions realized from premiums collected on and after the Effective Date) due Seller with respect to the Clients, irrespective of the attachment date or billing date of the insurance policies to which such commissions relate, provided, however, that direct bill policies shall be treated as set forth in subsection (c) below; (ii) all service fees due Seller for any services rendered in connection with the operation of the Acquired Assets and collected on and after the Effective Date by Seller; and (iii) all other commissions (including, but not limited to, profit sharing, override, contingent, supplemental or bonus type commissions), fees or other compensation paid, payable or due to Seller on or after the Effective Date in respect of the Acquired Assets irrespective of the date as of which such commissions, fees or other compensation was accrued or earned;

(c)    With respect to direct bill policies:  (i) Seller shall own all commissions on such policies actually received by Seller from insurance carriers before the Effective Date; (ii) Buyer shall own all such commissions actually received by insurance carriers on or after the Effective Date, regardless of when billed by the insurance carrier; and (iii) Buyer shall have the sole right to collect and handle all return premiums or other payments due to Seller from insurance companies actually received on or after the Effective Date, and Seller shall promptly forward to Buyer any such amounts received within three (3) business days of receipt;

(d)    The sole right to collect and retain all contingent commissions or similar compensation due to or received by Seller on and after the Effective Date in respect of the Acquired Assets from insurance underwriters in connection with contracts or other arrangements in effect on the Effective Date providing for such payments to Seller;

(e)    All of Seller's right, title and interest in and to the contracts and agreements listed and described in Schedule 1.1(e);

(f)    The property, whether tangible or intangible, of Seller, listed on Schedule 1.1(f), including without limitation, (i) all inventory, office supplies and other inventories of or for Company Business (whether stored on or off-site) and (ii) all furniture, equipment and supplies used in connection with the Company Business, except to the extent identified as an Excluded Asset;

(g)    Seller's Goodwill and the Acquired Marks;

(h)    Seller's Intellectual Property and all of the rights of Seller in any Intellectual Property licensed by Seller, including without limitation the Domain Names set forth on Schedule 4.2(bb);

(i)    Except as otherwise required by law, all personnel records and files of Seller and Seller Principal or his or its Affiliates relating to the Company Business with respect to any employee of Seller hired by Buyer or its Affiliates; (Seller reserving the right to make and retain copies thereof);

(j)    All originals, or where not available, copies, and electronic copies (if available) of all books and records relating to the Company Business; (Seller reserving the right to make and retain copies thereof);

(k)     All rights, to the extent assignable or transferable by law, to all permits, licenses, authorizations issued by a Governmental Entity relating to the Company Business, including those set forth on Schedule 1.1(k);

(l)     All rights and interests in and to Seller's bank accounts (Seller reserving the right to make and retain copies of all records) and to Seller's telephone numbers, domain name registrations and electronic mail addresses set forth on Schedule 1.1(l);

(m)     All rights, to the extent assignable or transferable by law, to the Insurance Premium Assets, including those set forth on Schedule 1.1(m);

(n)     All rights, claims and causes of action under confidentiality, non-disclosure, non-compete, non-solicitation, non-piracy and other restrictive covenant agreements with Employees, former employees, Affiliates, former Affiliates, Seller Principal, and agents of Seller, in each case, that run in favor of such Seller Party and relate to the Company Business; and

(o)     All rights, claims and causes of action of the Seller Parties against third parties (other than Buyer and its Affiliates) to the extent arising from or related to the Acquired Assets or the Assumed Liabilities.

"**Adverse Consequences**" means any damages, penalties, fines, costs, reasonable amounts paid in settlement, liabilities (including, without limitation, any liability which may arise under an alter ego, de facto control, de facto merger, successor, transferee or other similar theory or ground for liability), obligations, Taxes, liens, losses, diminution in value, expenses, fees and court costs and reasonable attorney's fees and expenses (but specifically excluding consequential, incidental, punitive, special or exemplary damages or damages for lost or expected profits except to the extent paid to third parties) incurred in connection with any action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, injunction, judgment, order, decree or ruling.

"**Affiliate**" means (a) with respect to any Person, any Person controlling, controlled by, or under common control with such Person (or an Affiliate of such Person), where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract, or otherwise; and (b) if such Person is a partnership, any general partner thereof.

"**Agreement**" as defined in the Preamble.

"**Assumed Liabilities**" means those obligations with respect to the Acquired Assets arising after the Effective Date and those liabilities specifically set forth on Schedule 1.3, including, without limitation, the Insurance Premium Liabilities and liabilities arising after Closing under the contracts and agreements listed and described in Schedule 1.1(e);

"**Balance Sheet Date**" as defined in Section 4.2(j).

"**Basket**" as defined in Section 6.3(d).

"**Buyer**" as defined in the Preamble.

"**Buyer Indemnitees**" as defined in Section 6.3(a).

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act and applicable rules and regulations, as amended from time to time.

"**Carrying on a Business**" as defined in Section 9.1(c).

"**Cash Consideration**" as defined in Section 2.1(a).

"**Cessation Date**" as defined in Section 9.1(b).

"**Client**" means any Person (including, without limitation, any insured, or any insured to whom or which any sub-producer provides insurances services) to whom or which Seller (or any of its employees or independent contractors on behalf of Seller) has provided, at any time within the twenty-four (24) months preceding the Closing Date, any services that Seller provides in the conduct of Company Business. For purposes of this Agreement, "Client" shall include, without limitation, any employer, employer group, affinity group, association and any shareholder or member of any of the foregoing, any individual insured, retail insurance agent or broker, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by such Person for such carrier or other entity.

"**Client Accounts**" shall mean the business account between Seller and any Client of Seller, including, without limitation, any Person who or which is provided any Company Business by Seller as of the Closing Date, regardless of whether such services are provided by, or through the licenses of, Seller or any of its agents.

"**Closing**" as defined in Section 5.1.

"**Closing Date**" as defined in the Preamble.

"**Closing EBITDA**" shall mean $1,091,963.

"**Closing Net Working Capital**" as defined in Section 2.3(b).

"**Closing Net Working Capital Sample**" as defined in Section 2.3(a).

"**Company Business**" shall mean the business conducted and presently proposed to be conducted by Seller, including, without limitation, quoting, placing, providing, servicing, and/or renewing Insurance Products or Services.

"**Confidential Information**" means any information of a Person, that is not already generally available to the public (unless such information has entered the public domain and become available to other persons in the same business as the Company Business through fault on the part of the Party to be charged hereunder), all of which the Parties agree shall be deemed to be trade secrets under the governing trade secrets law, including but not limited to: (i) the identity of any Client whose account constituted a Client Account at any time within the twenty-four (24) months preceding the Closing Date, as well as the identity of any Active Prospective Client as of such date; (ii) the identity, authority and responsibilities of key contacts at each such Client and

Active Prospective Client; (iii) the service cost burden with respect to each such Client and Active Prospective Client; (iv) the identities of markets or companies from which insurance coverages or other commitments, benefits or services for clients are obtained; (v) the types of insurance coverages, and/or consulting, third-party administration, employee communication, investment management, managed care, human resource and other services provided or to be provided specifically to any such Client or Active Prospective Client, and the internal corporate policies relating thereto; (vi) the specific insurance policies purchased by or for such Clients or Active Prospective Clients; (vii) the expiration dates, commission rates, fees, premiums and other terms and conditions of such policies; (viii) the risk specifications and other characteristics, and claims loss histories of such Clients or Active Prospective Clients; (ix) the nature of programs and plans, including their design, funding and administration, demographic characteristics and any other information supplied by, or developed for, such Clients or Active Prospective Clients; (x) operations manuals, prospecting manuals and guidelines, pricing policies and related information, marketing manuals and plans, and business strategies, techniques and methodologies; (xi) financial information, including information set forth in internal records, files and ledgers, or incorporated in profit and loss statements, fiscal reports and business plans; (xii) technology and e-commerce strategies, business plans and implementations, inventions, algorithms, computer hardware, software and applications (including but not limited to any source code, object code, documentation, diagrams, flow charts, know-how, methods or techniques, associated with the development or use of the foregoing computer software); (xiii) all internal memoranda and other office records, including electronic and data processing files and records; and (xiv) any other information constituting a trade secret under the governing trade secrets law.

"**Contingent Consideration**" as defined in Section 2.1(c).

"**Contingent Revenues**" means all contingent commissions, guaranteed supplemental commissions, profit sharing payments, bonuses, overrides and similar incentive-based or volume-based revenues payable by an insurance company or any other Person.

"**Coverage Period**" as defined in Section 5.2(m).

"**Data Export Files**" as defined in Section 7.4.

"**Direct Claim**" as defined in Section 6.5.

"**Earn-Out Payment**" as defined in Section 2.1(d).

"**EBITDA**" means, for any period, related solely to the Acquired Assets, means (a) net income, plus (b) income taxes, plus (c) interest expenses, plus (d) depreciation and amortization of tangible and intangible assets of the Acquired Assets as calculated in accordance with GAAP and the EBITDA methodology set forth on Exhibit B. For the avoidance of doubt, the EBITDA of the Acquired Assets that will serve as the baseline for the calculated EBITDA CAGR is the Closing EBITDA.

"**Effective Date**" as defined in Section 5.1.

"**Employee**" as defined in Section 4.2(n).

"**Employee's Plan**" as defined in <u>Section 4.2(o)(i)</u>.

"**Environmental, Health, and Safety Laws**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Resource Conservation and Recovery Act of 1976, and the Occupational Safety and Health Act of 1970, each as amended, together with all other applicable legal requirements (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of federal, state, local, and foreign governments (and all agencies thereof) concerning pollution or protection of the environment, public health and safety, or employee health and safety, including applicable legal requirements relating to emissions, discharges, releases, or threatened releases of pollutants, contaminants, or chemical, industrial, hazardous, or toxic materials or wastes into ambient air, surface water, ground water, or lands or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, or chemical, industrial, hazardous, or toxic materials or wastes.

"**Equity Consideration**" as defined in <u>Section 2.1(b)</u>.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Estimated EBITDA**" as defined in <u>Section 2.2(a)</u>.

"**Excluded Liabilities**" as defined in <u>Section 1.4</u>.

"**Final Measurement Period**" as defined in <u>Section 2.1(d)</u>.

"**First Measurement Period**" as defined in <u>Section 2.1(c)</u>.

"**FLSA**" means collectively, (a) the federal Fair Labor Standards Act, as amended, or any successor statute, (b) any equivalent state or local law, and (c) and any rules or regulations promulgated thereunder.

"**Fundamental Reps**" as defined in <u>Section 6.1(a)</u>.

"**Fraud**" as defined in <u>Section 6.3(d)</u>.

"**Goodwill**" means the goodwill of Seller associated with existing Clients and new patronage from Active Prospective Clients.

"**Governmental Entity**" means any government or any agency, bureau, board, commission, court, department, official, political subdivision, tribunal, arbitral body, or other instrumentality of any government, whether federal, state or local, or any arbitrational or mediational tribunal.

"**In-Force Policy**" or "**In-Force Policies**" the in-force insurance policies brokered (whether as the broker of record or otherwise), placed or sold by the Seller as of the Effective Date in the Acquired Assets.

"**Indemnifying Party**" as defined in <u>Section 6.4(a)</u>.

"**Indemnitee**" as defined in <u>Section 6.4(a)</u>.

"**Indemnity Cap**" as defined in <u>Section 6.3(d)</u>.

"**Insurance Premium Assets**" means all of Seller's cash and collections, each as solely related to insurance premiums' account receivables, less commissions included in such amounts, all determined in accordance with Seller's past practices consistently applied.

"**Insurance Premium Liability**" means all of Seller's accounts payable solely related to insurance premiums for which cash has been received by Seller as part of the Insurance Premium Assets, all determined in accordance with Seller's past practice consistently applied.

"**Insurance Products or Services**" means (a) Employee Benefits Products or Services, (b) Insurance-Related Services, and/or (c) P&C Products or Services, as such terms are defined below:

(a)     "<u>Employee Benefits Products or Services</u>" means (i) employer-sponsored benefits accounts with programs, whether self-insured or fully insured, such as group life, group health, group dental, group disability, group long-term care, ancillary benefits sold to groups, and similar or related products and services, and (ii) insurance procured for individual, natural persons (e.g., life, health, annuities, long-term care, and similar or related products and services).

(b)     "<u>Insurance-Related Services</u>" means any services provided to a Client, either directly or by a third-party service provider, whether or not for a fee and whether or not pursuant to a written contract, including but not limited to: third-party administration (TPA); risk management; loss control; compliance or other consulting services; claims analysis; insurance program administration; enrollment services; COBRA, Section 125 Cafeteria Plan, Health Savings Account (HSA) Plan, Health Reimbursement Arrangement (HRA) Plan, Health Flexible Spending Account (FSA) Plan, and/or Premium Reimbursement Arrangement (PRA) Plan administration; preparation, review, and/or filing of IRS Form 5500s; referrals to on-site medical clinics, attorneys, or other third-party service providers (whether or not a referral fee or other remuneration is paid by such providers for such referrals); or other services.

(c)     "<u>P&C Products or Services</u>" means (i) commercial lines or personal lines property and casualty insurance products, and/or (ii) commercial or individual bond or suretyship products.

"**Intellectual Property**" means all of the following in any jurisdiction throughout the world: (a) inventions (whether or not patentable or reduced to practice), patents, patent applications, and patent disclosures, together with all reissues, continuations, continuations-in-part, revisions, divisionals, extensions, reexaminations and counterparts in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, trade dress, corporate names and Internet domain names and all other indicia of origin (and all translations, adaptations, derivations, and combinations of any of the foregoing), together with all Goodwill associated with each of the foregoing; (c) copyrights (including "look and feel"), other works of authorship, mask works and moral rights; (d) issuances, registrations, applications, and renewals for any of the foregoing; (e) confidential business information, know-how and trade secrets; (f) software (including object code, source code, tools, applications, systems, databases, data and related documentation) and database rights; (g) all rights of privacy and publicity, including rights to use

of the names, likenesses, voices, signatures and biographical information of real Persons; (h) all other intellectual property and proprietary rights; and (i) all tangible embodiments of the foregoing (in whatever form or medium).

"**Intentional and Willful Violation**" as defined in Section 6.3(d).

"**Issuer**" as defined in Section 2.1(b).

"**Knowledge**" means, with respect to any Person, (i) the actual knowledge of such Person (including the actual knowledge of the officers, directors and key employees of such Person); and (ii) that knowledge which could have been acquired by such Person after making reasonable inquiry and exercising such due diligence as a reasonably prudent businessperson would have made or exercised in the management of his, her or its business affairs, including inquiry of those officers, directors, employees, agents and representatives of such Person who could reasonably be expected to have knowledge of the matters in question.

"**Leases**" as defined in Section 4.2(f).

"**Low-Rated Carrier**" as defined in Section 4.2(u).

"**Material Agreements**" as defined in Section 4.2(p).

"**Net Working Capital**" means the amount of working capital calculated in accordance with Schedule 2.3, which amount shall include (i) the Insurance Premium Assets and other current assets that are part of the Acquired Assets, including any cash and accounts receivable, and (ii) the Insurance Premium Liabilities and all accounts payable and other accrued current liabilities of Seller, relating to the Acquired Assets which will be prepared in accordance with Section 2.3 hereof.

"**Notice**" as defined in Article 15.

"**Objection Notice**" as defined in Section 2.2(b).

"**Objection Period**" as defined in Section 2.2(b).

"**Ordinary Course of Business**" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency), but in no event shall such term include any professional error or omission, or any act or event creating a severance obligation, wrongful discharge claim or similar liability.

"**Pandemic-Relief Debt**" means any indebtedness incurred in connection with any legal requirement or program involving any Governmental Entity providing or expanding any loan, guaranty, investment, participation, grant, program or other assistance in response to or to provide relief for the outbreak of COVID-19, including, without limitation, any PPP Loan, any U.S. Small Business Administration Economic Injury Disaster Loan, any loan under the Main Street Lending Program announced by the U.S. Department of Treasury and Board of Governors of the Federal Reserve, or any other similar federal, state or local Governmental Entity program.

"**Pandemic-Relief Debt Documentation**" means as to any Pandemic-Relief Debt (i) all documents, instruments and agreements evidencing or related to such Pandemic-Relief Debt, any collateral provided in respect thereof or any indemnity and/or hold-harmless agreement related thereto, (ii) all legal requirements governing such Pandemic-Relief Debt or that require certain action or inaction as a result of incurring such Pandemic-Relief Debt or the forgiveness thereof (including, without limitation, the requirement prohibiting the deferral of any employer's portion of Social Security Taxes pursuant to Section 2302 of the CARES Act or the requirement prohibiting the claiming of any Employee Retention Credit under Section 2301 of the CARES Act), and (iii) all applications (and all attachments, exhibits, addenda the like with respect thereto, including without limitation, information with respect to affiliation), submissions, reports, or other documentation (including, without limitation, payroll documentation and affiliation documentation) provided by or on behalf of Seller to any lender, lender agent or Governmental Entity in connection with applying for, obtaining, using the proceeds of, or seeking forgiveness of such Pandemic-Relief Debt.

"**Party**" or "**Parties**" as defined in the Preamble.

"**Payment Threshold**" as defined in Section 2.1(c).

"**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, limited liability partnership, or a Governmental Entity.

"**PPP Loan**" means a loan incurred under 15 U.S.C. 636(a)(36) (as added to the Small Business Act by Section 1102 of the CARES Act).

"**PPP Specified Forgivable Uses**" means uses of proceeds of an PPP Loan that are eligible for forgiveness under Section 1106 of the CARES Act (including, without limitation, "payroll costs" as defined in 15 U.S.C. 636(a)(36)(A)(viii) (as added to the Small Business Act by Section 1102 of the CARES Act)).

"**Producer**" as defined in Section 4.2(s)(i).

"**Production Statements**" as defined in Section 4.2(k).

"**Purchase Price**" as defined in Section 2.1.

"**Restricted Territory**" means those counties or similar geographic territories where (i) any Seller Party conducted Company Business as of the Closing Date and (ii) the Buyer conducts Company Business as of the Cessation Date, if applicable.

"**Restrictive Covenants**" means the covenants of the Seller Parties contained in Article 9 hereof.

"**Retained Variable Life Insurance Business**" means all rights of Seller in and to the variable life insurance products sold by Seller on behalf of Clients set forth in Schedule 7.6 including all rights of Seller to receive commissions and fees for the sale of such products to such Clients.

"**Securities Act**" as defined in <u>Section 4.1(e)</u>.

"**Security Interest**" means any mortgage, pledge, lien, encumbrance, charge, or other security interest of any nature whatsoever.

"**Seller**" as defined in the <u>Preamble</u>.

"**Seller Indemnitees**" as defined in <u>Section 6.2</u>.

"**Seller Principal**" as defined in the <u>Preamble</u>.

"**Seller's Financial Statements**" as defined in <u>Section 4.2(j)</u>.

"**Seller's Software**" as defined in <u>Section 4.2(g)</u>.

"**Set-Off Amount**" as defined in <u>Section 6.3(c)</u>.

"**Tail Coverage**" as defined in <u>Section 5.2(m)</u>.

"**Tax**" means any Federal, state, local or foreign income, gross receipts, payroll, employment, excise, premium, franchise, withholding, social security (or similar tax), unemployment, real property, personal property, sales, use, transfer, alternative or add-on minimum (including taxes under Code Sec. 59A), profits, estimated or other tax of any kind whatsoever, including any liability therefore as a transferee or successor under applicable law or by contract, or as a result of any Tax sharing or similar agreement, together with any interest, penalty or addition thereto, whether disputed or not.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Third-Party Claim**" as defined in <u>Section 6.4(a)</u>.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

Perry Insurance Group, Inc.

By: *David Perry*
_____
Signer ID 9899BBS4Y5...
Name: David A. Perry
Title:  President

**SELLER PRINCIPAL:**

*David Perry*
_____
Signer ID 9899BBS4Y5...
David A. Perry, as an individual

**BUYER:**

Relation Insurance Services Select, Inc.

By: _____
Name:  Joseph L. Tatum, Jr.
Title:   Chief Executive Officer

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

Perry Insurance Group, Inc.

By:     _____
Name:   David A. Perry
Title:   President

**SELLER PRINCIPAL:**

_____
David A. Perry, as an individual

**BUYER:**

Relation Insurance Services Select, Inc.

By:     *Joseph L. Tatum, Jr.*
Name:   Joseph L. Tatum, Jr.
Title:   Chief Executive Officer

*[Signature Page to Asset Purchase Agreement]*

**EXHIBIT A**

PURCHASE PRICE ALLOCATION

The Purchase Price shall be allocated as follows:

|  |  |  | *Tax Allocation* |
|---|---|---|---|
| Class I | Cash | To be determined post-Closing by Buyer and Seller Principal. |  |
| Class III | Accounts Receivables | To be determined post-Closing by Buyer and Seller Principal. |  |
| Class V | Furniture, Fixtures & Equipment | $25,000 |  |
| Class V | Prepaid & Other Miscellaneous Assets | To be determined post-Closing by Buyer and Seller Principal. |  |
| Class VI | Covenants not to Compete | 1% of Cash Consideration |  |
| Class VII | Goodwill | Remainder of Purchase Price to be allocated to Goodwill of Seller |  |
| *Total* |  |  |  |

**SCHEDULE .2(bb)**
**Intellectual Property**

<u>**Logo**</u>:



<u>**Domain Name**</u>:

https://www.perryinsgroup.com/